**Marvin BROWN, Plaintiff,**

v.

**GASTON COUNTY DYEING MACHINE COMPANY, a North Carolina corporation, Defendant.**

**Civ. A. No. 2136.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Dec. 31, 1970.

———◆———

Robert Belton, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiff.

J. W. Alexander, Jr. and Brown Hill Boswell, Blakeney, Alexander & Machen, Charlotte, N. C., for defendant.

## OPINION AND ORDER

McMILLAN, District Judge.

Marvin Brown, the plaintiff, a Negro now in his early thirties, filed suit on May 31, 1966, against Gaston County Dyeing Machine Company of Gastonia, North Carolina, alleging that he and other Negroes similarly situated were subjected to racial discrimination in matters of employment, classification, wages, promotion and other incidents of employment. The complaint alleges violations of 42 U.S.C. § 1981 and § 1983, and violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.* which became effective July 2, 1965. After several pre-trial conferences and extensive discovery and several abortive trial settings the case was tried on its merits on September 29 and 30 and October 1, 1970.

The defendant manufactures and installs dyeing machines. These are pressure vessels which are used in textile dye plants to dye various kinds of yarn (or threads) which are thereafter used for weaving cloth. A dyeing machine will receive a roll of yarn perhaps a foot or two in diameter and several feet long and will subject this yarn inside a heavy closed steel cylinder to liquid dye under considerable pressure so that the dye can penetrate all the fibers in the roll of yarn. These pressure tanks may weigh several tons; they are serviced by incoming and outgoing pipes of various kinds; and they have to stand hydraulic pressures without leaking. The lids and other portions are massive. The holes and projections for attachment to surrounding structures must be precisely made and located. The heavy lids must be properly balanced and attached. The foundations must be correctly welded and positioned and the various pipe connections and valves must be accurately machined and welded.

Welding is a major part of the process.

The assembly of the machines is done ordinarily by welder-fabricators who, in order to do this work, must have the skills of good welders and must also be able to read and follow blueprints and to weld to close tolerances. The positioning of the various parts and fittings of a dyeing machine relative to other parts

requires care, patience and skill. The process of assembling the dyeing machine and of boring holes in it and attaching fittings and positioning the various parts in proper relationship to each other is called "fabricating."

The welder-fabricators and supervisors receive top wages in the company.

As of September 5, 1969, the defendant employed approximately 215 hourly-paid production workers (see plaintiff's Exhibit 14) in 44 job classifications. Of these hourly-paid production employees, approximately 27 (13% of the total) were black. Black persons comprise about 13% of the population of Gaston County. As of September, 1969, there were no black employees in thirty-four (34) of the 44 job classifications. Except for three black employees in the "Layout and Leadman" category (wage range $2.35 to $3.47) the black employees are, for the most part, engaged in lower paying jobs such as "Grinding and Pickling," "Industrial Maintenance" and "Sandblaster." Of the approximately fifty-five (55) employees working in the "Welder-Fabricator" category on September 5, 1969, only one was black.

The defendant has no written guidelines for initial employment nor for advancement nor for wage increases. Notices of vacancies are not posted. Employees are notified of vacancies through personal contact. Wage increases are based on merit. Company supervisors and foremen initiate recommendations for wage increases.

The defendant maintained a welder training program on its premises from 1958 to 1968. The courses offered have run from sixteen (16) to forty (40) weeks. The defendant had exclusive control and discretion to determine the participants in this program. No black employees participated in the welder training program until about 1968. No black persons were employed as welders at any time before the plaintiff was so employed in 1961.

The non-white population of Gaston County is about 13%. There are no data on the numbers of black people trained or capable to work as welder in the job market, and no data on the proportions of black and white adults in the job market.

Trained people are in demand in Gaston County; the unemployment rate for all labor is very low, and has in recent years been as low as ¾ of one per cent.

Marvin Brown worked for the defendant part time for several months in 1959. His father and several other relatives worked there. He became interested in welding. Hubert Craig, president of the defendant, helped him go to school at A & T College in Greensboro where he learned basic welding and blueprint reading in two years of post-high school training. When Brown finished the welding course at A & T College he was given a job in 1960 with the defendant doing "pickling and grinding." This was a finishing-up type of job involving treating and smoothing the metal surfaces of work that had been welded or assembled by others. Brown asked for employment as a welder and was given to understand by supervisory people that it was premature to try to place a Negro in a job as welder with the defendant.

However, in 1961, Hubert Craig instructed his plant managers to give Brown a job as a welder and try to help him make progress in that work. From November of 1961 until he stopped working for the defendant a little over four years later in January, 1966, he progressed from welder-trainee at $1.15 an hour to Welder-Fabricator "B" at $1.90 an hour, which was about the midpoint of the range ($1.68 to $2.15) then in effect for welders of his classification. As a welder he did satisfactory work, with apparently no more than the usual number of errors.

Brown contends that he was denied promotion to higher classification and higher pay; that he was denied a chance to attend the local welding school; that white people, of no greater

experience and ability than he, were sent to welding school and promoted ahead of him; and that all these acts and patterns of discrimination were because of his Negro race.

Based upon the evidence, the court is not able to find nor interpret the facts as plaintiff contends. Although Brown may have been originally denied a welding job because of race, that decision was reversed in 1961 by Hubert Craig. Although Brown was not sent to the local welding school, the reasons were that Hubert Craig had already helped send him to A & T College where he had had at least as much training in welding and blueprint reading as he could get locally; attending the local school was not a condition precedent to advancement. Although some white employees progressed faster than Brown, there were valid reasons (for example, eight more years of welding experience in the case of James Dawes, and greater skill and adaptability on the part of others) shown for the differences; and there were other white welders who made *less* progress than Brown. Brown's progress in fact was at least as good as average among the welders in the plant.

The most important elements in the situation, however, were a group of intangible factors which hampered Brown in achieving the full capacity, skill, accuracy and flexibility which a welder-fabricator assembling high-cost machines should have. He was apparently convinced from the first that he was being discriminated against because of his race. When he received correction or suggestion, he usually attributed it to racial bias. He testified that in his four years of welding he never made a mistake! He was more intent on justifying the past than on improving for the future. He frequently went over the heads of his supervisors to take his troubles to Hubert Craig, the company president. He did not accept nor profit from supervision. He was not careful about routine company procedures.

The intangibles discussed above are easy to recite and could be a cloak for racial discrimination—and they have been scrutinized by the court with those possibilities in mind. After hearing the numerous witnesses and after observing and hearing the plaintiff the court is of the opinion, however, that they are legitimate and factual and that they, rather than race, account for any failure of the plaintiff to outstrip the most capable of his white competitors.

As to the class action, there are statistics and some testimony which show that, at least in prior years, welding and high pay in the defendant's shop were not for black men. On the other side of the ledger are a number of facts which should be considered. All company functions, on and off the premises, have been desegregated for a decade or so. Brown himself was employed in 1961 to be a welder and his advancement was encouraged. When the Civil Rights Act took effect in 1965, the policy was announced that the Act would be observed. Advertisements for welders for at least two years have been without regard to race. Since 1965, defendant has made genuine and often successful efforts to recruit black workers for the higher paid welding jobs, and have offered promotional transfers to black employees. Some have accepted those transfers and gone ahead; a larger number have tried the welder-fabricator life and then abandoned it for more familiar and less exacting tasks.

It may be that this suit has been a spur of sorts to motivate the defendant in its recent efforts to recruit black welders and to promote black employees to higher paying jobs. Such motivation *if it exists does not impart impropriety to defendant's actions, nor entitle plaintiff to relief not supported by the evidence.*