Adam BAXTER, Plaintiff,

v.

SAVANNAH SUGAR REFINING COR-
PORATION, Defendant.

Civ. A. No. 2304.

United States District Court,
S. D. Georgia,
Savannah Division.

Oct. 6, 1972.

Fletcher Farrington, Bobby L. Hill, Hill, Jones & Farrington, Savannah, Ga.,

Jack Greenberg, William L. Robinson, Morris J. Baller, New York City, Robert Belton, Charlotte, N. C., Kenneth L. Johnson, Baltimore, Md., for plaintiff.

John E. Simpson, Miller, Beckmann & Simpson, Savannah, Ga., J. Lewis Sapp, Constangy & Prowell, Atlanta, Ga., for defendant.

## ORDER

ALAIMO, District Judge.

Plaintiff brought this class action on March 8, 1968, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. He subsequently filed an amendment to include allegations that the Civil Rights Act of 1866, 42 U.S.C. § 1981 also was violated. The amended complaint charges that the defendant employer has discriminated against the plaintiff and the class which he seeks to represent with respect to compensation, terms, conditions and privileges of employment, because of race. Plaintiff's allegations are mainly directed against the defendant's policies and practices in regard to promotion of employees.

Prior to commencement of this action, plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission on January 12, 1966, in accordance with the provisions of the Act[1], alleging that the defendant had failed to promote plaintiff to the position of boiler room foreman or relief foreman because of his race. He now seeks a declaratory judgment, injunctive relief, an award of back pay, attorneys' fees and costs of the action individually and for the class.

Defendant denied all the substantive allegations of the complaint.

The action was tried to the Court on May 29, 1972, following which the Court

---

1. 42 U.S.C. § 2000e–5: "(a) Whenever it is charged in writing under oath by a person claiming to be aggrieved . . . that an employer . . . has engaged in an unlawful [employment] practice . . . the Commission . . . shall make an investigation of such charge. . . . (e) If within thirty days after a charge is filed with the Commission . . . the Commission has been unable to obtain voluntary compliance with this subchapter, the Commission shall so notify the person aggrieved and a civil action may, within thirty days thereafter, be brought against the respondent named in the charge. . . ."

made a personal tour of defendant's entire operation, and this viewing supports the Court's findings. The Court's findings and conclusions follow.

## THE CLASS ACTION

*In limine,* a hearing was held under the provisions of Rule 23(c)(1), Fed.R. Civ.P. and this Court ruled on December 9, 1968, Baxter v. Savannah Sugar Refining Corp., D.C., 46 F.R.D. 56, 58, that the action would proceed with the class being limited to the employees in the boiler room operation with respect to back pay awards or mandatory promotions. The Court's order further made it clear, 46 F.R.D. 56, 61, that plaintiff was entitled to seek declaratory and injunctive relief to prevent future plant-wide discriminatory practices by defendant and that discovery would be permitted pertinent to discriminatory practices in all departments of operation. This order limiting the class was expressly made subject to alteration or amendment at a later date.

The plaintiff subsequently filed a motion to enlarge the class, which was heard on May 17, 1972. At that time the Court advised counsel for both parties that the admission of evidence on trial of the case would not be limited to the class as previously described by this Court's order of December 9, 1968, and that the Court would allow evidence concerning plant-wide discrimination.

Before proceeding to a final decision, it is appropriate at this point to redefine the class represented by plaintiff. This is militated by the evidence adduced on trial of the case and by decisions rendered subsequently to this Court's order limiting the class.

"While it is true, as the lower court points out, that there are different factual questions with regard to different employees, it is also true that the 'Damoclean threat of a racially discriminatory policy hangs over the racial class [and] is a question of fact common to all members of the class.'" Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1124 (5 Cir. 1969).

■ Note that a portion of the decision in the *Johnson* case dealing with a claim for back pay contained no language either limiting or broadening the class with specific reference to this form of relief. While Rule 23(b)(2) contains a pointed reference to "injunctive relief or corresponding declaratory relief," it contains no language limiting it to those types of relief, and it does not support the proposition that no monetary relief may be ordered in a class action under Rule 23(b)(2). Robinson v. Lorillard Corp., 444 F.2d 791 (4 Cir. 1971).

"We are . . . unable to perceive any justification for treating such a suit as a class action for injunctive purposes, but not treat it so for purposes of other relief." Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720 (7 Cir. 1969).

■ Although the Court does not make an award of back pay herein, the plaintiff will henceforth be deemed to represent Negro employees in all departments of operation in defendant's refinery with respect to all forms of relief afforded by the Act. Enlargement of the class at this time can be effected without notice to any members since this action was brought pursuant to Rule 23(b)(2), under which such notice is not mandatory. Johnson v. City of Baton Rouge, Louisiana, 50 F.R.D. 295 (E.D. La.1970), and Northern Natural Gas Co. v. Grounds, 292 F.Supp. 619 (D.Kansas 1968).

## THE INDIVIDUAL PLAINTIFF

The defendant's principal business is refining, distribution and sale of cane sugar. The refinery is located at Port Wentworth, Georgia, and defendant maintains executive offices in downtown Savannah. Defendant is an employer within the meaning of 42 U.S.C. § 2000e (b) of the Act.

The plaintiff has been employed by the defendant at its refinery since June 27, 1955, having begun as a general laborer at $1.33 per hour. He is now employed at $3.51 per hour as a senior electrician's helper. He began work in de-

fendant's electric shop on July 1, 1957, where his duties consisted of cleaning electric motors, replacing light bulbs, assisting in the cutting of conduit pipe, and assisting electricians in the performance of their duties. On September 7, 1959, the plaintiff started working as a relief helper in the defendant's boiler room, where he substitutes for regular boiler room helpers on weekends and holidays and when the regular employees are absent or on vacation. While working in the boiler room the plaintiff has been paid at his regular rate as an electrician's helper as that rate is higher than the boiler room helper's rate. The plaintiff's duties as relief helper in the boiler room consist of opening and closing valves as directed by the foreman, carrying boiler water samples to the plant laboratory for analysis, and performing housekeeping chores.

The boiler room supplies all the electrical energy and steam used by defendant in operation of the refinery. It is the heart of the refinery and contains equipment exceeding a million dollars in value. The boiler room operates twenty-four hours a day, seven days a week and is manned on a three-shift basis, with two employees assigned to each shift, one foreman and one helper. Three employees are classified as boiler room foremen and three as boiler room helpers. In addition, there are one or more relief foremen and one or more relief helpers. The primary jobs of these relief employees are elsewhere in the refinery and they are used in the boiler room on a temporary basis.

The boiler room operator, or foreman, is required to read and monitor in excess of thirty dials and gauges, which record critical information such as the steam pressure and water flow of the three high-pressure steam boilers, the chemical content of incoming boiler feed water and the sugar content of water coming to the boiler room from the refining process. Each hour, during his shift, he determines the consistency of incoming boiler feed water with a chemical analysis kit maintained in the boiler room. He is responsible for recording steam, water flow, gas and fuel oil measurements in a boiler room log, which is used by defendant's engineering department to determine operational efficiency and the necessity for any corrections. The boiler room foreman is responsible for operating the char revivifier, essential to the refining process, and the turbo generator which produces the plant's electricity. It is incumbent upon him to notify the appropriate personnel in the event of any malfunction or emergency. The boiler room foreman is also in charge of plant security on weekends and after 4:30 p. m. weekdays.

The personal viewing of the boiler room operation by the Court disclosed that it was a highly sophisticated and complicated operation.

The duties of boiler room foreman demand a conscientious person with a thorough knowledge of the complicated automated equipment of the boiler room and the ability to foresee necessary changes and adjustments which must be made in the equipment that controls the steam load and insures the safety of the three boilers. Past experience has made it apparent that mechanical background and aptitude are necessary for operations and well-nigh indispensable to the integrity of the entire plant operation. The employees who have successfully performed as boiler room foremen or relief foremen have had mechanical backgrounds as either general mechanics or pipefitters, or have had previous experience in the operation of a boiler room. The performance of the helper's job does not give one sufficient training and experience to perform successfully as foremen. A six-month training period is normally necessary for the foreman's job, to train an individual who already possesses a mechanical background.

There have been two vacancies in the boiler room foreman's classification since the effective date of the Act. The first of these vacancies was filled on January 1, 1966, when Euless Hodges was promoted from the senior pipefit-

ter's classification. Hodges, employed since October 11, 1954, had been a relief boiler room foreman since November 29, 1954. The second vacancy was filled on June 6, 1966, when Joseph C. Brinson was promoted from the classification of packaging department mechanic. Brinson was employed initially on February 14, 1957, and began working as a relief foreman in November, 1965. Two employees have been trained as relief foremen in the boiler room since the effective date of the Act. Dennis Holiday, a senior mechanic in the Company's general mechanics department, began training on April 28, 1967; and Frank Williams, a Black, who is a senior pipefitter in the general mechanics department, began training on July 13, 1968. These four men were significantly better qualified and possessed superior mechanical backgrounds than plaintiff for the job of foreman or relief foreman in the boiler room.

Eleven persons were employed in the defendant's electrical department at the time of this trial. Eight of the eleven were employed in classifications paying more than the classification in which plaintiff is employed. Seven of these eight persons have worked in the Company's electric shop longer than plaintiff. Since the effective date of the Act, there have been no vacancies and therefore, no promotions in jobs in the electrical department paying more than that of plaintiff.

█ The plaintiff has been given written warnings on four occasions for failure to perform his work properly and for violation of plant rules. He has an unfavorable personnel record and what is considered a bad attitude toward his work, as evidenced by the testimony of numerous witnesses and his demeanor in the courtroom. He has been given the opportunity on three different occasions to transfer into the boiler room as a regular helper, but has refused the transfer on each occasion. Moreover, plaintiff does not have a mechanical background as do all the four men promoted to the position of boiler room

foreman or trained as relief foreman since the effective date of the Act. Each of those promoted had significantly better qualifications than plaintiff. The Court finds that the defendant has not discriminated against the individual plaintiff because of his race in failing to promote him to the position of boiler room foreman or relief foreman.

"Although Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act, it certainly did not desire to melt job qualifications having no racially discriminatory ingredient or controlling pre-Act antecedent." United States v. Jacksonville Terminal Co., 451 F.2d 418 (5 Cir. 1971). See also Griggs v. Duke Power Co., 401 U.S. 424 at 430, 91 S.Ct. 849 at 853, 28 L.Ed.2d 158, and Cooper v. Ivan Allen, Jr., Mayor, 467 F.2d 836 (5 Cir. 1972).

### THE ISSUE OF CLASS-WIDE DISCRIMINATION

█ Baxter's failure to establish his claim for individual relief will not bar relief for the class he represents. Bowe v. Colgate-Palmolive Co., 7 Cir., 416 F.2d 711 at 719; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 428 (8 Cir. 1970). It is therefore necessary to consider evidence pertaining to plant-wide discrimination at defendant's refinery.

On the effective date of the Act, the defendant employed 505 regular employees at its refinery and 319 of these, or 63.2 percent, were black. At that time, the Company had fifty-four job classifications which contained more than one person. Three of these classifications were integrated, twenty-six were held by Whites only, and the remainder by Blacks only.

Since 1960, when it employed approximately seven hundred regular employees, the Company has experienced a gradual decline in employment which resulted from automation of the defendant's processes and the development and use of new types of machinery. The defend-

ant's total employment of regular employees declined by 14 percent between July 2, 1965, and June 30, 1971, as by then the regular employees numbered 433 at the refinery, of which 272, or 62.8 percent, were black. By July 30, 1971, there were fifty-five job classifications containing more than one employee. At that time the integrated classifications had increased to thirteen and the number of classifications, including Whites only, had decreased to eighteen.

From January 1, 1966, through January 1, 1972, defendant hired forty-nine new employees. Twenty-seven, or 55 percent, of these were black. During this period of time, the average rate of pay was approximately the same for new hires, whether white or black. From 1965 through May 29, 1972, there were 170 employee promotions at the defendant's plant. Ninety-five, or 55 percent, of these promotions went to black employees. The defendant attempts to promote current employees into higher level job classifications. However, the Company's opportunities to promote employees have been limited by the fact that its employees serve an average span of 17.4 years and the turnover rate is approximately two to four percent per year. This leads to a very stable work force. Moreover, total plant employment has declined 14 percent since July, 1965.

The defendant's executive vice-president, R. O. Sprague, issued a notice on June 29, 1965, to all the Company's supervisors announcing that it was the policy and intent of the Company to comply with the Act, 42 U.S.C. § 2000 and to give each applicant and employee the same consideration regardless of race, color, religion or national origin. On January 1, 1968, the defendant voluntarily adopted an Affirmative Action Program, which it has maintained continuously since that date. Under the Affirmative Action Program defendant has utilized written descriptions for the various job classifications. It has also held numerous training classes for the employees to equip them to qualify for more difficult and higher paid positions. Since adoption of the program, black employees have received 62 percent of all promotions in the plant. And while the number of white supervisory employees has declined by one, the number of black supervisors has increased from one to eleven.

The foregoing indicates that the pre-Act pattern of segregated job classifications has been reduced by a significant extent through positive efforts by the defendant. The Court is convinced that the employer has willingly and conscientiously taken steps to eliminate pre-Act segregation practices.

In the presentation of his case, plaintiff has relied heavily upon statistics. See United States v. Hayes Intern. Corp., 456 F.2d 112 (5 Cir. 1972). While black and white employees begin at the same rate of pay, Blacks ultimately fall behind the earning power of their white co-workers. Throughout the years from 1965 to 1971, the income gap between black and white employees at defendant's plant has widened. In 1965, the average wage for white employees was $105.86 per week, while Blacks averaged only $92.23 per week. In 1968, white employees of the Company averaged earning $126.60 per week while Blacks averaged only $104.84. In 1971, the defendant's white production employees earned an average weekly wage of $156.94 while Blacks earned only $134.13. Black employees in segregated job classifications in 1971 earned $27.05 less on the average than Whites working in all white jobs. In 1965, the gap was $20.20. A portion of the statistical data is attached as Appendices I, II, and III, indicating the representation of Black employees at various levels of the wage scale at relevant times. These data reflect that while defendant has recently achieved more dispersal of black employees into the higher wage levels, nevertheless the relative position of all black employees in comparison with the earnings of white employees has not improved. It is obvious that of the 95 black employees promoted from 1965 until the date of trial,

only a few were promoted into formerly all-white or integrated job classifications. The majority of these promotees remained in segregated job classifications.

On the other hand, plaintiff has not proved discrimination against any specific individual to the Court's satisfaction. He called three of defendant's current employees as witnesses: his brother, Johnny Baxter, George Buckins and Summer Wallace. Each of these witnesses complained because a certain promotion had been granted to another Negro. None complained because a desired promotion was awarded to a white employee. Another witness, Frank King, who had voluntarily terminated his employment, had complained to the personnel counselor that Blacks were not being promoted to the job of checker in the white sugar warehouse. After his complaint, a number of Blacks were promoted into the Checkers' jobs.

If the evidence discussed has appeared inconclusive, a clear answer may be found by looking at defendant's formal procedure for granting promotions. So far as appears from the evidence, defendant's job descriptions do not delineate qualifications; there is no system of posting notice of vacancies, and any information regarding job vacancies is disseminated through supervisory personnel. This naturally tends to channel and limit information regarding vacancies to those employees within segregated job classifications where such vacancies occur. One of the defendant's witnesses testified that employees become aware of all job vancancies by word of mouth within twenty-four hours. However, almost all promotions are granted without request from employees. Thus, rumor is not the kind of effective notice needed to eliminate the consequences of pre-Act segregation practices.

The personnel manager testified that in granting promotions defendant considers the factors of qualifications and seniority and in each instance attempts to choose the employee best-qualified for the vacancy under consideration. If two or more employees are similarly qualified, the one with most seniority normally receives the promotion. Promotions are determined by consultation among the personnel manager, the plant superintendent and the employee's immediate and past supervisor. There are no written instructions or guidelines for supervisors pertaining to qualifications necessary for promotions. Under this system of judging qualifications, it is apparent that the supervisors' subjective evaluation of the employee's ability is an important factor in his advancement and an individual supervisor could, if he were so inclined, exercise racial discrimination in his selection of candidates for promotion. Promotion procedures which depend largely upon the subjective recommendation of the employee's supervisor are a ready mechanism for discrimination which may be concealed from management. Rowe v. General Motors Corp., 457 F.2d 348 (5 Cir. 1972).

■ In accord with the decision in the *Rowe* case, *supra,* this Court finds that the defendant's promotion procedures violate Title VII in the following particulars:

1. The supervisor's recommendation is the most important factor in the promotion process.

2. Supervisors are not furnished written instructions specifying qualifications necessary for promotion.

3. The standards referred to in the testimony (work experience, desire for improvement, leadership potential, etc.) are vague and subjective.

4. Employees are not notified of promotion opportunities, nor are they notified of the qualifications necessary for promotion.

5. There are no safeguards in the procedure designed to avert discriminatory practices.

The Act imposes upon employers an affirmative duty to devise and implement pertinent *objective* criteria for determining which employees available for promotion are qualified to fill particular vacancies. United States v. Jackson-

ville Terminal Co., 5 Cir., 451 F.2d 418 at 453.

However, keeping in mind that the defendant's evidence establishes a positive effort to seek out and promote qualified personnel among its black employees, the finding of a violation of Title VII is bottomed on the following language of the Act: "It shall be an unlawful employment practice for an employer . . . to limit, segregate, or classify his employees in any way which would . . . . tend to deprive any individual of employment opportunities . . . because of such individual's race. . ." 42 U.S.C. § 2000e–2(a)(2). In the absence of satisfactory proof of discrimination within the class, the Court does not find that the employer's promotion practices have, in fact, deprived the class within the prohibitions of 42 U.S.C. § 2000e–2(a)(1)—only that such practices *tend* to deprive the class of employment opportunities within the statutory prohibitions of 42 U.S.C. § 2000e–2(a)(2).

Allegations of plaintiff's petition charging other violations of Title VII are not supported by the evidence, which shows without conflict that restroom, locker and dining facilities at defendant's plant are used by all employees without regard to race.

Plaintiff's complaint mainly attacked defendant's system of promoting current employees. It did not aim specifically toward hiring practices, nor does the Court find from the evidence that there has been any racial discrimination by defendant in its system of hiring new employees.

## THE ISSUE OF BACK PAY

■ The Court in its discretion will limit relief here to a decree prohibiting such future violations of the Act as have been pointed out above. It is deemed that two factors combine to make an award of back pay inappropriate. First, the defendant has acted in good faith and made a positive effort to eliminate pre-Act segregation practices. *Cf.* Parham v. Southwestern Bell Telephone Co.,

433 F.2d 421 (8 Cir. 1970). Second, the plaintiff has failed to adduce satisfactory proof that such relief is needed to make the class whole. There has been no proof of a significant number of members of the group possessing qualifications who have been damaged by discriminatory practices notwithstanding their qualifications for promotion. Concerning the burden of proof, see generally Dobbins v. Local 212, International . Brotherhood of Electrical Workers, D.C., 292 F.Supp. 413, 445–446. "Congress granted broad discretion to the District Court to fashion remedies in Title VII cases as the equities of the particular case compel." LeBlanc v. Southern Bell Tel. & Tel. Co., 460 F.2d 1228 (5 Cir. 1972), aff'ing. 333 F.Supp. 602 (E.D.La.1971).

Additionally, the Court was impressed with the evidence that defendant's wage rates are higher than those of any other industry in the Savannah metropolitan area; its unbroken history of annual wage increases to all employees, without any discrimination; its policy, broken only during three depression years, of 15 percent annual bonus to all employees; its summer student employment program for employees' children, again without the slightest evidence of any discrimination; its policy of no layoffs when jobs were abolished by automation. In substance, the Court feels that the evidence supports the conclusion that the defendant was a poor target for this type action.

## ATTORNEYS' FEES AND COSTS

■■ One who succeeds in obtaining injunctive relief under Title VII should ordinarily recover attorneys' fees unless special circumstances would render an award unjust. Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263; Robinson v. Lorillard Corp., 4 Cir., 444 F.2d 791 at 804. *Cf.* Weeks v. Southern Bell Tel. & Tel. Co., 467 F.2d 95 (5 Cir. 1972) and Callahan v. Wallace, 466 F.2d 59 (5 Cir. 1972); 6 Moore's Federal Practice, pp. 1356–1357.

Plaintiff's attorneys have submitted evidence and affidavits to the Court concerning the time spent in the preparation and trial of the case. Based upon this evidence including that of experienced counsel for the defendant, and applying the guidelines set forth so concisely in Clark v. American Marine Corp., 320 F.Supp. 709 (E.D.La.1970), I will make an award of Twelve Thousand Five Hundred Dollars ($12,500) as attorney's fees for the plaintiff, together with Six Hundred Forty-seven Dollars and Sixty-five Cents ($647.65) expenses, in addition to otherwise allowable costs.

## DECREE

The Savannah Sugar Refining Corporation, its officers, agents, employees, servants and all persons in active concert or participation with them, are hereby permanently enjoined and restrained from discriminating against the Negro employees of the defendant Savannah Sugar Refining Corporation at its refinery at Port Wentworth, Georgia, in violation of Title VII of the Civil Rights Act of 1964.

In particular, it is ordered and decreed that defendant shall take certain affirmative action as hereinafter set forth, within ninety (90) days, to implement defendant's policy of equal employment opportunity at its refinery and to discharge defendant's obligations under law not to discriminate on the basis of race or color in the promotion of employees.

1. The defendant shall furnish supervisory personnel at its Port Wentworth refinery written instructions delineating objective criteria and specific qualifications necessary for promotion or transfer of employees with respect to all job classifications in which vacancies occur.

2. The defendant shall post on bulletin boards in conspicuous places throughout all departments at its refinery notices of all job vacancies available for promotion or transfer of current employees. Said notices shall contain a specific job description for each vacancy, the rate of pay, and information with respect to the qualifications required and how and where application can be made.

3. The defendant shall place on bulletin boards in conspicuous places in all departments throughout its refinery notices containing information of training programs designed to equip employees with necessary skills for advancement. Said notices shall remain posted a reasonable length of time, shall particularize the benefits to be derived from the training and the qualifications required for entry into them, and shall specify how and where interested employees can make application to participate.

4. The defendant shall establish a committee, to consist of a reasonable number of management personnel, to insure that no employees shall be denied review or consideration for promotion or transfer at its refinery solely for the reason that he is not supported by the recommendation of his supervisor. Defendant shall continually keep posted in all departments at its refinery notices informing employees of the existence, availability and purpose of the review committee.

5. The defendant shall continue its current practice of giving qualifications paramount consideration in promoting employees.

6. The defendant shall continue to provide training programs to increase the skills and qualifications of its labor force and enable the employees to qualify for advancement and job transfers.

7. To implement the retention of supervision of this action the defendant shall make quarterly reports to the Court outlining its action in compliance with this decree. This report should include information concerning advancements and promotions, transfers, hirings, training programs and the job descriptions and qualifications referred to in paragraph three above.

## JURISDICTION

The Court will retain jurisdiction of this cause for a period of two years.

During such time, either party may by appropriate motion request modification of this order in light of new factual and legal developments.

## APPENDIX I

Number of Employees, in all Job Classifications, by Race and hourly rate, and average weekly earnings by Race, Savannah Sugar Refining Corporation, July 2, 1965.

### Number of Employees and Amount Earned

| Hourly Rate | White | Amount Earned Per Week | Black | Amount Earned Per Week |
|---|---|---|---|---|
| 3.66025 | 5 | 732.05 | | |
| 3.2795 | 20 | 2623.60 | | |
| 3.1845 | 6 | 764.28 | | |
| 3.1075 | 4 | 497.20 | | |
| 3.0225 | 1 | 121.90 | | |
| 2.92 | 45 | 5256.00 | 5 | 584.00 |
| 2.86 | 4 | 457.60 | | |
| 2.80 | 2 | 224.00 | | |
| 2.77 | 12 | 1329.60 | | |
| 2.745 | 2 | 219.60 | | |
| 2.72 | 2 | 217.60 | | |
| 2.68 | 6 | 643.20 | | |
| 2.64 | 1 | 105.60 | | |
| 2.637 | 3 | 316.44 | | |
| 2.61 | 6 | 626.40 | | |
| 2.60 | 3 | 312.00 | | |
| 2.59 | 12 | 103.60 | 18 | 1864.80 |
| 2.583 | 1 | 103.32 | | |
| 2.54 | 21 | 2133.60 | | |
| 2.5195 | 10 | 1007.80 | | |
| 2.50 | 3 | 300.00 | 1 | 100.00 |
| 2.48 | 1 | 99.20 | 7 | 694.40 |
| 2.47 | 3 | 296.40 | 1 | 98.80 |
| 2.46 | 2 | 196.80 | | |
| 2.45 | 7 | 686.00 | 19 | 1862.00 |
| 2.44 | | | 1 | 97.60 |
| 2.43 | | | 26 | 2527.20 |
| 2.40 | | | 3 | 288.00 |
| 2.37 | | | 9 | 853.20 |
| 2.3675 | 1 | 94.70 | | |
| 2.35 | | | 3 | 282.00 |
| 2.34 | | | 1 | 93.60 |
| 2.33 | 1 | 93.20 | 28 | 2609.60 |
| 2.28 | | | 119 | 10,852.80 |
| 2.12 | | | 78 | 6614.40 |
| 1.62 | 2 | 129.60 | | |
| Total | 186 | $19,690.39 | 319 | $39,422.40 |

Average weekly income: White $105.86 Black $92.23

## APPENDIX II

Number of Employees, in all Job Classifications, by Race and hourly rate, and average weekly earnings by Race, Savannah Sugar Refining Corporation, July 2, 1968.

### Number of Employees and Amount Earned

| Hourly Rate | White | Amount Earned Per Week | Black | Amount Earned Per Week |
|---|---|---|---|---|
| 4.0025 | 5 | 800.50 | | |
| 3.6245 | 19 | 2754.62 | | |

### APPENDIX II (Cont'd)

### Number of Employees and Amount Earned

| Hourly Rate | White | Amount Earned Per Week | Black | Amount Earned Per Week |
|---|---|---|---|---|
| 3.5295 | 6 | 847.08 | | |
| 3.4525 | 3 | 414.30 | 2 | 276.20 |
| 3.45 | | | 1 | 138.00 |
| 3.41 | 1 | 136.40 | | |
| 3.36 | 1 | 134.40 | | |
| 3.32 | 4 | 531.20 | 1 | 132.80 |
| 3.24 | 48 | 6220.80 | 3 | 388.80 |
| 3.18 | 4 | 508.80 | | |
| 3.16 | 1 | 126.40 | | |
| 3.14 | 2 | 251.20 | | |
| 3.10 | 4 | 496.00 | | |
| 3.00 | 3 | 360.00 | | |
| 2.99 | 7 | 837.20 | 5 | 598.00 |
| 2.95 | 5 | 590.00 | | |
| 2.9425 | 6 | 706.20 | | |
| 2.93 | 3 | 351.60 | | |
| 2.92 | 9 | 1051.20 | 2 | 233.60 |
| 2.90 | 3 | 348.00 | | |
| 2.893 | 1 | 115.72 | | |
| 2.89 | 5 | 578.00 | 20 | 2312.00 |
| 2.86 | | | 1 | 114.40 |
| 2.85 | 7 | 798.00 | | |
| 2.84 | | | 5 | 568.00 |
| 2.8295 | 8 | 905.44 | | |
| 2.81 | | | 1 | 112.40 |
| 2.80 | 3 | 336.00 | | |
| 2.76 | 2 | 220.80 | 20 | 2208.00 |
| 2.75 | | | 6 | 660.00 |
| 2.74 | | | 1 | 109.60 |
| 2.71 | | | 9 | 975.60 |
| 2.70 | | | 3 | 756.00 |
| 2.6675 | 1 | 106.70 | | |
| 2.63 | 2 | 210.40 | 60 | 6312.00 |
| 2.60 | | | 6 | 624.00 |
| 2.58 | | | 87 | 8978.40 |
| 2.41 | | | 77 | 7422.80 |
| 1.90 | 2 | 152.00 | | |
| Totals | 165 | $20,888.96 | 314 | $32,920.60 |

Average weekly income: White $126.60 Black $104.84

## APPENDIX III

Number of Employees, in all Job Classifications, by Race and hourly rate, and average weekly earnings by Race, Savannah Sugar Refining Corporation, June 30, 1971.

### Number of Employees and Amount Earned

| Hourly Rate | White | Amount Earned Per Week | Black | Amount Earned Per Week |
|---|---|---|---|---|
| 4.81 | 7 | 1346.80 | | |
| 4.40 | 16 | 2816.00 | | |
| 4.30 | 5 | 860.00 | 1 | 172.00 |
| 4.23 | 5 | 846.00 | 1 | 169.20 |
| 4.22 | 1 | 168.80 | | |
| 4.09 | 1 | 163.60 | | |
| 4.08 | 4 | 652.80 | 1 | 163.20 |
| 4.00 | 2 | 320.00 | 2 | 320.00 |
| 3.97 | 48 | 7622.40 | 5 | 794.00 |
| 3.96 | 11 | 1742.40 | 12 | 1900.80 |
| 3.85 | 1 | 154.00 | | |
| 3.82 | 2 | 305.60 | | |

### APPENDIX III (Cont'd)

#### Number of Employees and Amount Earned

| Hourly Rate | White | Amount Earned Per Week | Black | Amount Earned Per Week |
|---|---|---|---|---|
| 3.81 | 3 | 457.20 | | |
| 3.76 | 1 | 150.40 | | |
| 3.73 | 2 | 298.40 | | |
| 3.67 | | | 1 | 146.80 |
| 3.66 | 7 | 1024.80 | | |
| 3.64 | 3 | 436.80 | 1 | 145.60 |
| 3.63 | 6 | 871.20 | 5 | 726.00 |
| 3.61 | 2 | 288.80 | | |
| 3.60 | | | 5 | 720.00 |
| 3.56 | 11 | 1566.40 | | |
| 3.53 | 5 | 706.00 | 2 | 282.40 |
| 3.51 | 2 | 280.80 | 14 | 1965.00 |
| 3.50 | 4 | 560.00 | 1 | 140.00 |
| 3.49 | 5 | 698.00 | 1 | 139.60 |
| 3.46 | 2 | 276.80 | 17 | 2352.00 |
| 3.45 | | | 9 | 1242.00 |
| 3.44 | | | 4 | 550.40 |
| 3.41 | | | 4 | 545.60 |
| 3.40 | | | 3 | 408.00 |
| 3.38 | | | 2 | 270.40 |
| 3.37 | 1 | 134.80 | 2 | 269.60 |
| 3.32 | 1 | 132.80 | 47 | 6241.00 |
| 3.27 | 2 | 261.60 | 70 | 9156.00 |
| 3.09 | 1 | 123.60 | 62 | 7663.20 |
| Totals | 161 | $25,266.80 | 272 | $36,482.80 |

Average weekly income:  White $156.94   Black $134.13