**Rosalind B. MARIMONT, Plaintiff,**

v.

**Joseph A. CALIFANO et al., Defendants.**

Civ. A. No. 1992–73.

United States District Court,
District of Columbia,
Civil Division.

Jan. 30, 1979.

As Amended March 13, 1979.

---

Lawrence Speiser, Washington, D. C., for plaintiff.

Richard J. Webber, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiff was employed by the National Institutes of Health in July of 1960 as a GS–13 mathematician.[1] Her complaint alleges discrimination on account of sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, because of the failure of the agency to promote her to grade GS–14.

### I

In 1964, plaintiff was recommended for promotion to a GS–14 by her supervisor, Dr. John Hearon, Chief, Office of Mathematical Research, National Institute of Arthritic and Metabolic Diseases. The promotion recommendation was not forwarded to the final decision-makers by the Director of Intramural Research at the National Institute of Mental Health and thereby in effect denied. Subsequently, Mrs. Marimont was transferred to another subunit of the National Institutes of Health, the National Institute of Neurological Disease and

---

1. Prior to that time, and since 1942, she was employed at the National Bureau of Standards.

Stroke, where she again functioned as a mathematician. In May of 1971, the Scientific Director of that Institute appointed a special *ad hoc* committee of three scientists thoroughly familiar with plaintiff's work to review plaintiff's work, with a view toward recommending her for promotion to GS–14. The *ad hoc* panel, a so-called peer review committee, unanimously recommended plaintiff for promotion, and Dr. Henry Wagner, Scientific Director, presented the recommendation to the Board of Scientific Directors of NIH, a body consisting principally of the Scientific Directors of those Institutes having intramural research programs and who are in charge of such programs.[2] During its deliberations, the Board indicated that the promotion recommendation would not be approved, and Dr. Wagner withdrew the request. It is the denial of her promotion in 1971 that plaintiff claims to be an act of sex discrimination (although the 1964 incident was also admitted into evidence in support of the 1971 discrimination claim).[3]

Shortly after the denial, Mrs. Marimont filed an informal EEO complaint. There followed a desk audit, the preparation of a new job description for Mrs. Marimont,[4] and another denial of her promotion, this time by Dr. Eldon Eagles, Acting Director of the Institute. In February 1972, plaintiff filed a formal complaint of discrimination with the Office of Equal Employment Opportunity at NIH, and in May 1973 a decision was issued by that office and approved by the Acting Director at NIH. The EEO decision stated in pertinent part that

"there may have been, through omissive and subtle discrimination an affect (sic) on the promotional opportunities in this case." The decision proposed that plaintiff be promoted. Seven months later, the Director of the Equal Employment Opportunity Staff of the Department of Health, Education, and Welfare issued a decision purporting to adopt the proposed disposition but holding that Mrs. Marimont was not discriminated against because of sex when she failed to receive her promotion.[5]

Ultimately, in October 1973, plaintiff was promoted to a grade GS–14. However, this action was brought on November 1, 1973, requesting that her promotion be made retroactive to June 23, 1971, the date when her promotion was denied by the Board of Scientific Directors, and it further requests backpay and attorney's fees. Additionally, plaintiff seeks an injunction to require defendants to adopt a plan to eliminate discrimination against women at NIH, including a requirement for goals and timetables for the promotion to higher level positions, and the promulgation of objective promotion criteria.

## II

In a Title VII case such as this, a three-step procedure is generally required: (1) plaintiff has the burden of making a showing of a *prima facie* case of discrimination on the basis of sex;[6] (2) if such a showing is made, the burden shifts to defendant to articulate legitimate nondiscriminatory reasons for the particular personnel

2. The Board of Scientific Directors passes on all personnel actions above grade GS–11 before they are passed on for formal decision by NIH management.

3. The 1964 events cannot form an independent basis for court jurisdiction. *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

4. These processes suffered from various, relatively minor, procedural deficiencies.

5. There is some question whether there ever was a proper delegation of authority from the Secretary of HEW through the appropriate chain of supervision to the Director of the EEO Staff, and plaintiff argues that in the absence of

a showing of such a valid delegation, the decision of the Acting Director of NIH should be regarded as final. In view of the disposition of this case, it is not necessary to explore or decide that issue.

6. The Court indicated in *McDonnell Douglas, infra,* that normally this burden will be carried by a showing that the plaintiff belongs to a protected minority, that he applied for and was qualified for the job, that he was rejected, and that after the rejection the employer sought other applicants. However, the Court emphasized that these specifications are not necessarily applicable in every respect to different factual situations. 411 U.S. at 802, 93 S.Ct. 1817.

action; and (3) if defendants are able to articulate legitimate nondiscriminatory reasons for the personnel action, the burden shifts back to the plaintiff to demonstrate that the reason is in actuality a pretext for discrimination. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the instant case, it is not necessary to pursue the entire three-step procedure, for plaintiff has made out a *prima facie* case of discrimination which defendants have been unable to rebut.

▮ First. In a memorandum and order dated November 28, 1977, Judge Sirica of this Court, to whom this case was at that time assigned, stated in denying cross motions for summary judgment that

> A fair evaluation of these conflicting contentions and . evidentiary materials to which they refer leads the Court to conclude that plaintiff has made a substantial showing of discrimination in connection with her 1971–72 application for promotion  . . . . the Court can state that it is defendants' burden to show 'by clear and convincing evidence' that [negative evaluations concerning plaintiff's qualifications] reflect an accurate appraisal of plaintiff's qualifications and professional standing and are not merely pretextual. If defendant fails to carry this burden—and in the circumstances it is indeed a weighty one—the result required by [*Day v. Mathews,* 174 U.S.App. D.C. 231, 530 F.2d 1083] is clear.

Thus, Judge Sirica has already found in this litigation that plaintiff has made out a *prima facie* case of discrimination. While that determination is technically not the law of the case, since Judge Sirica ultimately denied both motions for summary judgment, it is nevertheless persuasive.

Second. The National Institutes of Health has found that there may have been discrimination against this plaintiff. In the decision of the NIH Deputy Equal Employment Opportunity Office of May 22, 1973, which was approved by the Acting Director of NIH, it was concluded that "the record does support the fact that improper management and personnel administration may have resulted in omissive and subtle discrimination, which even if unconscious, results in positive career damage" and further, as noted above, that through such discrimination there may have been an effect on plaintiff's promotional opportunities.[7] To be sure, that decision of the NIH management was not concurred in by an official in the Office of Equal Employment Opportunity of the Department of Health, Education, and Welfare. However, as noted (note 5 *supra*), there is doubt concerning the jurisdiction of that official, and in any event, it does not appear that he had any factual basis upon which to bottom a conclusion at variance with that reached at NIH.

Third. In 1964 and again in 1971, Mrs. Marimont's direct supervisors recommended her for promotion. During the 1971 proceedings, a peer review group composed of scientists thoroughly familiar with plaintiff's work was appointed, and that body likewise and unanimously recommended her promotion.[8] Nevertheless, on both occasions, the promotion was vetoed by higher authorities. It is unnecessary to impugn the good faith of the Board of Scientific Directors which caused the withdrawal of the 1971 promotion recommendation to conclude that plaintiff's promotion opportunities were improperly curtailed. *United States v. Hazelwood School District,* 534 F.2d 805, 813 (8th Cir. 1976), *reversed on other grounds,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The members of that Board were unclear as to the proper standards and rationales to be

---

7. The decision directed that, among other things, realistic employment standards for plaintiff's position be established, to be consistent with Civil Service policies.

8. The supervisors and colleagues who supported plaintiff's promotion testified at trial that her qualifications for promotion were marginal, but this after-the-fact assessment is not reflected in the actual promotion documents.

applied to promotion actions;[9] they were not nearly as familiar with plaintiff's capabilities as a mathematician as the peer review committee; and they did not consider or consult the most relevant guide concerning the promotion of research scientists—the Research Grade-Evaluation Guide issued by the Civil Service Commission.

Fourth. The standards by which plaintiff's promotion recommendations were judged were ill-defined and adhered to with different degrees of faithfulness and understanding by members of the Board of Scientific Directors. Some members of the Board testified that they opposed plaintiff's promotion because, although they did not question her abilities as a mathematician, they felt that her mathematical skills and performance were not sufficiently related to biomedical research. Other members of the Board were not concerned with the relationship of her work to this admittedly primary responsibility of NIH, but considered her to be only a "marginal" mathematician at the GS–14 level. Still other members of the Board felt that plaintiff's specific responsibilities and performance, whatever her innate abilities, did not justify the promotion. There was thus a considerable difference of opinion among the Scientific Directors as to the appropriate role for the Board; that is, whether it was to consider candidates for promotion based on their own achievements and potential as scientists (the "man-in-the-job" concept); whether promotions were to be based on the usefulness of their particular performance at the Institute or branch in which they were functioning; or whether promotions were to be granted depending on the value of the employees' work or potential to NIH as a body.[10] While it cannot be said with certainty that this confusion of understandings and rules was sex-oriented, it does take on significance in the context of a case in which plaintiff's peers and immediate supervisors consistently recommended her for promotion, and the decision-makers just as consistently rejected her.[11]

Fifth. Dr. John Hearon, who twice recommended plaintiff for promotion (once in 1974 as her supervisor and once in 1971 as a member of the special *ad hoc* committee), while firmly denying that plaintiff had been the victim of sex discrimination, conceded that her case had been "disgracefully handled." The witness was apparently referring to the process by which plaintiff was moved from one institute to another and detached for work to various units within NIH. Again, whatever the witness' subjective view of the reasons for the mishandling of plaintiff's career at NIH, his opinion adds one additional bit of circumstantial evidence to support plaintiff's claim of discrimination.

■ Sixth. The Board of Scientific Directors which rejected plaintiff's promotion on the basis of subjective criteria[12] was composed exclusively of white males. See *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972); *Wade v. Mississippi Cooperative Extension Service,* 372 F.Supp. 126 (N.D.Miss.1974), *aff'd.,* 528 F.2d 508 (5th Cir. 1976); *Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377 (4th Cir. 1972); *United States v. NL Industries,* 479 F.2d 354 (8th Cir. 1973).

Seventh. While the statistics concerning employment at NIH are far from conclusive, the fact is that to an overwhelming

9. NIH concedes that the Board "is not a formally chartered group [and] does not function under explicit operational guidelines." Plaintiff's Exh. 11.

10. A personnel management evaluation of NIH conducted by the Public Health Service in 1974 noted (p. 3) that "it is generally unknown by those whose positions are being reviewed just how the Board decides whether individuals are to be promoted or not promoted." Plaintiff's Exhibit 48.

11. One of plaintiff's witnesses, Marvin Shapiro, was promoted from GS–13 to GS–14 after only two years at NIH, and he considered her work as good as his own.

12. While subjectivity is inherent in decisions made at the academic research level (see p. 1226 *infra*), the lack of consistent guidelines serves "to corroborate, not to rebut" other evidence upon which an inference of discrimination may be based. *Brown v. Gaston County Dyeing Machine Co., supra,* 457 F.2d at 1383.

degree, higher-level positions at NIH were in 1971 occupied by males.[13]

Eighth. Plaintiff was not promoted for a period of thirteen years although there was never a complaint concerning her performance, and she published a substantial number of scientific papers.[14]

■ None of these factors is direct proof of discrimination on account of sex, and all of them in combination do not conclusively prove such discrimination. Yet it is obvious that direct proof of discrimination is almost impossible to provide, for by its very nature discriminatory purpose and intent—especially in this day and age—must be demonstrated circumstantially. The Court finds that on the basis of the circumstantial factors enumerated above plaintiff has established a *prima facie* case.

This finding is not the equivalent of a conclusion that the scientists at NIH who have been passing on plaintiff's promotion over the years were guilty of a determined purpose to discriminate or maliciously to deny to plaintiff her just recognition. While purposes and motives are difficult to evaluate, especially in areas such as this, it is the Court's view that the inartful comment of the NIH Equal Employment Opportunity Officer regarding what he considered omissive and subtle discrimination may not be far off the mark. The evidence suggests that had Mrs. Marimont been an especially outstanding scientist she would in all likelihood not have been held back; but inasmuch as she was merely able and competent, the Board of Scientific Directors saw no need to be especially forthcoming in the case of this woman scientist. Compare note 11 *supra*.[15]

The evidence which sustains the finding of a *prima facie* case of disparate treatment based on sex also compels the conclusion that defendants have not articulated a legitimate non-discriminatory reason for her non-promotion.[16] Plaintiff is accordingly entitled to a promotion to a grade GS–14 as of June 21, 1971, and the appropriate back pay and attorney's fees.

### III

Plaintiff also requests a broad injunction requiring hiring and promotion goals; the establishment of objective promotion criteria; and improved promotion procedures.

■ The request for numerical hiring and promotion goals and timetables at NIH will be denied. The Court's decision in this case is based on the peculiar factual circumstances involving this plaintiff, including the repeated recommendations for promotion, the findings that she had the requisite qualifications, and the conclusions of the EEO and other officials concerning her treatment and the handling of her case. There was, however, no proof of broad-scale discrimination against women at NIH.

Plaintiff's statistical case was undermined by defendants' expert who demonstrated that, absent consideration of the relevant labor market, it is impossible to draw significant conclusions from plaintiff's statistics. See *Hazelwood School District v. United States, supra; Castanada v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498

---

**13.** 102 man and 2 women were in managerial positions; 186 men and 3 women in supergrade positions; and 36.3% of the male professional staff and 4.8% of the female professional staff were in positions at GS–13 and above.

**14.** It must, however, be recognized that the failure to achieve promotion may be due in part to the fact that, unlike most of her senior colleagues, plaintiff did not have a Ph.D. degree, she worked only part time, and she was not engaged in the biomedical sciences—the mainstream at NIH.

**15.** It is at least of passing significance that one witness (Dr. Eagles) testified that he became conscious of fairly widespread racial discrimi-

nation at NIH only after traumatic confrontations with black employees, and he concluded that this discrimination was due essentially to insensitivity rather than to race hatred. While there is some dispute as to whether the witness did or did not at one time acknowledge that a similar situation existed with respect to discrimination on account of sex, his testimony is compatible with the conclusion that the treatment of plaintiff by some senior scientists was colored by outmoded attitudes.

**16.** It follows that the question of any pretextual reason need not be reached.

(1977); *Olson v. Philco-Ford,* 531 F.2d 474 (10th Cir. 1976). Plaintiff was likewise unable to show that NIH employees were suffering from the present effects of past discrimination against women, at least insofar as any inference of NIH culpability on this score is concerned. Finally, as previously noted, the evidence does not demonstrate a general practice of personnel decisions being made in 1971 based upon considerations of sex, let alone that such decisions are being made on that basis now. Thus, hiring goals and other affirmative action programs are not warranted.

The Court likewise rejects plaintiff's demand for an order mandating the adoption of objective promotion criteria. The imposition by a court of rigid performance and promotion standards is inappropriate in the context of the responsibilities exercised by the Board of Scientific Directors of the National Institutes of Health. In scientific research, as in some other areas of academic inquiry, adherence to objective standards would be stifling and counterproductive, for it is inherently impossible to separate the potentially gifted and productive innovator from the plodding imitator by means of purely objective criteria. Cf. *Spurlock v. United Airlines, Inc.,* 475 F.2d 216, 219 (10th Cir. 1972); *Cooper v. Allen,* 493 F.2d 765 (5th Cir. 1974).[17] Any attempt to condition professional recognition and advancement upon static factors could only visit harm upon the development of science and the spirit of scientific inquiry without any counterbalancing advantages. Those making promotion decisions in the research disciplines must be free to consider such intangibles as creativity, originality, resourcefulness, potential, and scientific curiosity, and the Court will not deprive NIH of its freedom to judge scientists by these yardsticks.

Different considerations govern plaintiff's request for more well-defined procedures. The problems plaintiff encountered in her career at NIH were inextricably intertwined with the amorphous procedures which regulate promotion decisions at the National Institutes of Health. Fair and definite procedures constitute an important safeguard against abuse—whether deliberate or arising out of outmoded attitudes—against those who have not traditionally been in positions of authority, especially when the job standards themselves are largely subjective. See *Baxter v. Savannah Sugar Refining Corp.,* 350 F.Supp. 139 (S.D. Ga.1972), *modified,* 495 F.2d 437 (5th Cir. 1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). Such procedures need not inhibit decision-makers when they make substantive judgments in a responsible way; yet they will go far toward eliminating the opportunity for discrimination, including the type of discrimination revealed by the record in this case.

In implementation of these conclusions, defendants will be directed to improve NIH promotion procedures to insure compliance with the following minimum requirements: (1) the role of the Board of Scientific Directors in the promotion process must be formalized, (2) in evaluating promotion recommendations, the members of the Board must give consideration to the Research Grade-Evaluation Guide or some other standard, (3) NIH must clarify the extent to which promotions to some or all of the scientific positions at higher levels will be based upon individual achievement or potential, usefulness of the employee to the unit to which he is assigned, or usefulness of the employee's work or background to the over-all NIH mission,[18] and (4) in passing upon promotion recommendations the Board of Scientific Directors must consider at a minimum the report of any peer review committee, the employee's job description, and the employee's publications and scientific recognitions. Defendants will be required to submit to the Court within

---

17. In this area such decisions as *Rowe v. General Motors Corp., supra,* must be applied with care and caution.

18. While the Research Grade-Evaluation Guide deals with some of these issues, it does not do so very clearly or coherently, and in any event there appears to be wide discrepancies in the actual application of the Guide at NIH.

forty-five days a proposal for implementing these procedural standards.

An order is being issued this date in conformity with this Opinion.