Patrick T. HAIRSTON et al., Plaintiffs,

v.

McLEAN TRUCKING COMPANY, a corporation of Winston-Salem, North Carolina, et al., Defendants.

No. C-77-WS-68.

United States District Court, M. D. North Carolina, Winston-Salem Division.

Nov. 20, 1972.

Findings of Fact and Conclusions of Law Sept. 4, 1973.

Judgment and Memorandum Order Jan. 23, 1974.

Opinion on Motion for Reconsideration April 18, 1974.

Robert Belton, of Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

Renn Drum, of Drum & Liner, Winston-Salem, N. C., Hugh J. Beins, Washington, D. C., for defendant Local 391.

W. P. Sandridge, of Womble, Carlyle, Sandridge & Rice, Claude M. Hamrick, Winston-Salem, N. C., for defendant employers.

## MEMORANDUM ORDER

HIRAM H. WARD, District Judge.

This matter comes before the Court on plaintiffs' motion to reconsider a prior order denying their motion to amend their amended complaint. In order to discuss the motion it becomes necessary to give a brief review of the history of this case.

On June 6, 1968, plaintiffs filed their complaint alleging that defendants, McLean Trucking Company (McLean) and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 391 (Local 391) had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. On June 28, 1968, plaintiffs filed an amended complaint whereby they charge defendant Local 391 with breaching their duty of fair representation by acquiescing in discriminatory policies and practices. In October 1968 defendants filed their answers. On June 2, 1969, plaintiffs filed an amendment to their amended complaint making Modern Automotive Services, Inc. a wholly-owned subsidiary of McLean, a party defendant to the action.

On August 8, 1969, an initial pre-trial conference and hearing was held before the late Chief Judge Edwin M. Stanley. There the deadline for completion of discovery was set at June 1, 1970. Extensive discovery was conducted by the parties. The final pre-trial conference was held before Judge Eugene A. Gordon on March 5, 1971. Trial date was set for March 17, 1971. At the conference, plaintiffs orally moved to amend the amended complaint to allege a violation of 42 U.S.C. § 1981. The motion was denied, even though the Court was aware of the liberal rule in favor of amendment. The reason given for the denial was that the actual trial was too close. Thereafter, on March 11, 1971, plaintiffs filed a motion to amend the amended complaint again seeking to add an allegation of violation of 42 U.S.C. § 1981 as an additional legal theory of recovery. In that motion plaintiff admitted that discovery had been completed on February 2, 1971, but stated that the facts used to support recovery under their Title VII claim would also support their claim under Section 1981.

On the first day of the trial, June 14, 1971, held before Judge Stanley, plaintiffs told the Court that they were proceeding under 42 U.S.C. § 1981 in addition to Title VII of the Civil Rights Act of 1964. The Court made no ruling at that time.

At the close of their evidence plaintiffs again raised their motion to amend the complaint. They asserted they would rely on the same evidence used to support the Title VII claim in order to prove the Section 1981 claim. They further stated that the purpose of the

amendment was so that the Court could look at the pre-July 2, 1965, evidence substantively. The Court denied the motion saying the amendment was made almost three years after the litigation was filed.

Because of Judge Stanley's unfortunate demise before he rendered judgment in the case, the parties agreed to have it decided by another judge. On July 8, 1972, all parties stipulated to have the case decided by the instant Court, "without receiving further evidence."

On October 17, 1972, a hearing was held in this case in which the plaintiffs' motion to amend was argued. During the hearing, plaintiffs claimed that they would not put on more evidence if the amendment were allowed. They further claimed its allowance would mainly serve to cure any jurisdictional defects. However, plaintiffs refused to accept the allowance of the amendment on condition that they agree not to ask for relief for discrimination prior to the effective date of the Civil Rights Act of 1964 (July 2, 1965). Plaintiffs gave some indication that they felt that the amendment would permit the Court to grant remedies for a period of three years prior to their filing a complaint with the EEOC which would be May 31, 1964. Defendant responded by saying that there may be a problem concerning the applicable statute of limitations under Section 1981 and further, that depending on the resolution of that question, new evidence might be required.

■■■ The present posture of the case indicates that the wiser course of action dictates that plaintiffs' motion to amend be denied. The Court is not unaware of the liberality of Rule 15, Federal Rules of Civil Procedure, in favor of allowing parties to amend their pleadings. See Woods Exploration & Producing Company v. Aluminum Company of America, 438 F.2d 1286 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). As stated in Woods, notice to the party is often a key factor to consider when a new theory of recovery is being added. There an amendment was allowed at a point in the trial when there was ample opportunity to conduct discovery, and no prejudice or surprise would befall the opposing party.

The instant motion comes before this Court after the trial has ended and after the parties have stipulated to have the case decided without the taking of additional evidence.

The Court views with reluctance plaintiffs' attempt to overturn the decisions of two previous judges. It has been said that there is "a general judicial policy that motions for rehearing matters once determined should be granted only under the most exceptional circumstances." In Re Ahmann, 331 F. Supp. 384, 389 (W.D.Mo.1971), in Footnote 2. See also Metropolitan Liquor Company v. Heublein, Inc., 50 F.R.D. 73 (E.D.Wis.1970), and Riss & Company v. Association of Western Railways, 162 F.Supp. 69, 71 (D.D.C.1958). Of course, that is not to say previous orders by the court must be deemed immutable if vacating them becomes necessary to accomplish justice. "The purpose of a motion for reargument is to apprise the court of any decision or fact that it overlooked in rendering its decision on the issues presented by the parties." Hernandez v. Koninklijke Nederlandsche Stoomboot Maatschappij N.V., et al., 259 F.Supp. 658, 659 (S.D.N.Y.1965). It cannot be said that plaintiffs have advised the court of any new law or facts since their motions were denied by the other judges.

■■■ In the instant case, plaintiffs first mentioned their desire to add an allegation of a violation of 42 U.S.C. § 1981 in the spring of 1971. This was almost three years after they filed their complaint. In their brief plaintiffs mention that the Fourth Circuit Court of Appeals had not approved of using Section 1981 in a racial discrimination employment case until Brown v. Gaston

County Dyeing Machine Company, 457 F.2d 1377 (4th Cir. 1972), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972). The implication is that the use of Section 1981 in employment discrimination cases was a novel theory in the spring of 1971, and they cannot be faulted for raising it at a late date in the instant case. However, it cannot be said that the ruling in *Brown* was so unexpected that plaintiffs could not have reasonably foreseen it.[1] The vitality of the Civil Rights Act of 1866 gained new life by the Supreme Court's decision in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), which dealt with Section 1 of that Act, now 42 U.S.C. § 1982. Other circuit courts began approving of the use of Section 1981·in employment discrimination cases in 1970. Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir. 1970), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L. Ed.2d 231 (1971). In fact, plaintiffs' counsel plead Section 1981 in the *Brown* case, decided by the district court on December 31, 1970, 325 F.Supp. 541 (W.D. N.C.1970). Thus this Court rejects any attempt by plaintiffs to say that their delay in seeking to amend their complaint arose because of a recent and unexpected change in the law.

■ The allowance or refusal to permit amendment lies in the discretion of the district court. That decision is not subject to review except for abuse of discretion. Because of the particular· facts of this case, including its submission on the beforementioned stipulation, the Court hesitates to overrule the other judges' decisions, unless substantial in-

justice would result. Ordinarily, as stated in 3 Moore's Federal Practice, para. 15.08(4) (2d ed. 1968):

> The more common reasons for denying leave to amend are that the amendment will result in undue prejudice to the other party, is unduly delayed, is not offered in good faith, or that the party has had sufficient opportunity to state a claim and has failed.

> The above reasons are, of course, not exhaustive. And a court may deny leave to amend for some other good and sufficient reason.

■ Mere delay in the offering of an amendment to a pleading should not serve as the sole reason for denying the request. However, it is a factor which the court can consider in determining a just result. See Rogers v. Valentine, 306 F.Supp. 34 (S.D.N.Y.1969), aff'd, 426 F.2d 1361 (2nd Cir. 1970). In the instant case, plaintiffs' tardiness in making the motion will be held against them. This is done not for reasons of vindication, but because their procrastination could result in adversely affecting this case and the parties in it.

■ The Court must examine the prejudice defendants would suffer should amendment be allowed. Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77, 87–88 (1971). *Zenith* involved a complex patent infringement and antitrust suit. Defendant sought to change its theory of defense after the record was closed. The court held that substantial prejudice would befall plaintiff if the motion were allowed. Defendant could then plead the statute of limitations as to certain of plaintiff's damage claims. This, in turn, would deny plaintiff its right to prove damages, or else it

I. See Perez v. Chutick and Sudakoff et al., 50 F.R.D. 1 (S.D.N.Y.1970), where the state court in 1969 expanded plaintiff's right to sue for breach of warranty, and the federal court held plaintiff's attempt to amend his complaint, as a result of that decision, came

too late. The new ruling was said not to be unexpected. Thus plaintiff should have asserted his claim in the original complaint. By waiting, plaintiff prejudiced defendant because now the statute of limitations prevented defendant from suing his supplier.

would have necessitated a reopening of the record and a retrial of the damage issues. Facing those choices the Supreme Court upheld the trial court's decision denying defendant's motion.

In Standard Title Insurance Company v. Roberts, 349 F.2d 613 (8th Cir. 1965), plaintiff tried to amend his complaint two and one-half years after filing of the original complaint to add a new theory of recovery. The case had by that time been taken under advisement. The Court of Appeals affirmed a denial of the motion, noting that to have granted it would entail a partial retrial.

This Court, in line with *Zenith, supra* and *Standard Title Insurance Company, supra,* also views with disfavor plaintiffs' motion because it would necessitate a partial retrial. The case was accepted for decision with the express stipulation of the parties that no more evidence would be taken. To permit plaintiffs to amend their complaint at this late date would be in direct contravention of that stipulation on which is based this Court's authority to render a decision. While a partial retrial might minimize prejudice to defendants, this Court declines to travel that avenue because of the stipulation, and as a result of the exercise of its discretion in these matters. Zenith Radio Corp. v. Hazeltine Research, *supra.*

In addition to the above grounds, other factors are present in this case which lead the Court to deny plaintiffs' motion. After looking over the voluminous record in the case, and observing the amount and length of time consumed by it, the Court feels that this case must not be subject to further delays. The Court's docket contains many other matters needing time and attention. As said in Nevels v. Ford Motor Company, 439 F.2d 251 (5th Cir. 1971):

While it is generally true that leave to file amendments should be freely given, Fed.R.Civ.P. 15(a), amendments should be tendered no later than the time of pretrial, unless compelling reasons why this could not have been done are presented. In these times of log-jammed trial dockets, a trial judge must exercise sound discretion in deciding motions for leave to amend. His decision must weigh good cause shown for the delay in moving, *vis a vis* dilatoriness of counsel resulting in last minute surprise and inability of opposing counsel to meet the tendered issue. *See* Albee Homes, Inc. v. Lutman, 3 Cir. 1969, 406 F.2d 11, 14; Inland Container Corp. v. Atlantic Coast Line R. R., 5 Cir. 1959, 266 F.2d 857, 861; 3 J. Moore, Federal Practice, §§ 15.08(4), 16.12 (2d ed. 1968).

By allowing plaintiffs' motion to amend, this Court could open Pandora's box. Defendants may need more time to discover and present evidence. Plaintiffs, in spite of their denials, may then also seek to enlarge the record in order to adequately present their claim. The question as to the proper statute of limitations of Section 1981 may well embroil the parties in protracted proceedings in order to decide that issue.[2]

The Court feels that the interests of justice would be better served by resolution of the main controversy before this Court. Plaintiffs seek to vindicate their rights to equal employment opportunities. That cause is not served by further impediments to a prompt conclusion of those issues.[3] The relief which plaintiffs may obtain under Title VII of the

2. See Judge Dupree's separate opinion in Brown v. Gaston County Dyeing Machine Company, *supra,* footnote 7, for a discussion of the different period of limitations which may affect the operation of Section 1981 in North Carolina.

3. A major complaint in this action is that blacks have not been given an opportunity to compete for over-the-road trucking jobs. The Court takes cognizance of the fact that during the pendency of this suit, some plaintiffs have expressed reluctance over accepting other jobs with defendant because they felt that their advancement in age has now made those jobs too physically strenuous for them.

Civil Rights Act of 1964 is not materially enhanced by the addition of an allegation of violation of Section 1981 to their cause of action. If this Court felt that plaintiffs' suit might be seriously jeopardized by a failure to satisfy the jurisdictional requirements for commencing an action under Title VII, it may well have viewed plaintiffs' motion in a different light.[4] However, should that event arise when the Court considers the case on the merits, there will be time enough to reconsider the ruling today. Until that time the wiser course of action demands that plaintiffs' motion be denied and that this case be moved on the docket so a final decision can be rendered before the passage of time makes a futile gesture of any individual relief which might be granted to plaintiffs.

It is, therefore, ordered that plaintiffs' motion to have the Court reconsider its prior order denying their motion to amend their amended complaint is hereby denied, and in furtherance of this Court's reasons for denying the motion, the Clerk of this Court is requested to schedule this matter for final oral argument on the merits at the earliest practicable date.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs instituted this action pursuant to the Civil Rights Act of 1964 (Act), 42 U.S.C. § 2000e et seq., and as a class action pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure. They seek injunctive and declaratory relief, along with back pay and an award of attorneys' fees.

The action came on for trial on June 14, 1971; the Honorable Edwin M. Stanley, late Chief Judge of the Middle District of North Carolina, presiding. By stipulation, this Court was requested to decide the case on the record. Plaintiffs have asked the Court to reconsider Judge Stanley's order denying them permission to amend their complaint, in order to additionally allege a violation of 42 U.S.C. § 1981. This was denied in a memorandum order dated November 21, 1972.

A determination concerning the validity and extent of the class action aspect of the suit was made during the trial by Judge Stanley after plaintiffs rested their case, and before defendants presented their evidence. He held that the action was "maintainable as a class action, and the members of the class are those Negroes now employed, or who have at any time in the past been employed, or who might hereafter seek employment, in the tire department of the maintenance department of MAS."

Having considered the entire official file, the briefs, and oral arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law, as required by Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

(a) *The Parties*

1. The plaintiffs consist of seventeen Negro citizens. At the time of the suit, all resided in Winston-Salem, North Carolina, and worked at the tire recapping department of Modern Automotive Services, Inc. The dates on which plaintiffs commenced their employment encompass times both before and after the effective date of the Act (July 2, 1965). They all belonged to the same union. Each of them filed a complaint with the Equal Employment Opportunity Commission (EEOC), covering the subject matter of this action.

2. McLean Trucking Company (McLean) operates as a motor common car-

4. In the October 17, 1972, hearing before this court, plaintiffs said one of the main reasons for their desire to amend their complaint was to ensure that this court had jurisdiction of the controversy. However, when the court inquired whether plaintiffs would stipulate to allowing the amendment along with limiting relief to that granted under Title VII, they said they would not so agree.

rier in the eastern, southern, and mid-western parts of the United States. It is a North Carolina corporation with its principal place of business in Winston-Salem. It has three categories of employees: (1) general office, (2) over-the-road drivers, and (3) terminal employees. This case does not concern itself with the first category of employees, only the last two.

The over-the-road drivers and the terminal employees work under separate contracts. The over-the-road drivers transport freight between terminals, usually by tractor-trailers. They perform the long haul work and receive compensation, basically for the miles they drive. They are not assigned regular routes, nor do they work regular hours. This unit constitutes a recognized bargaining unit by the National Labor Relations Board, and it operates under a collective bargaining contract. The National Master Freight Agreement and the Carolina Freight Council Over-The-Road Supplemental Agreement cover the drivers at the Winston-Salem terminal.

The terminal employees work under a collective bargaining agreement which is termed the city cartage contract. Mc-Lean divides its city cartage employees into three major classifications: (1) switchers or (2) checkers, who handle freight on the terminal's dock, and (3) city drivers, who haul goods from the terminal to the customer. These workers constitute a separate bargaining unit recognized as such for collective bargaining purposes by the National Labor Relations Board. The Winston-Salem employees are covered by the National Master Freight Agreement and the Carolina Freight Council City Cartage Supplemental Agreement. They work regular hours and shifts, and receive compensation on a per hour basis.

At all material times McLean has employed over one hundred persons in its operations.

3. Modern Automotive Services, Inc., (MAS) is a North Carolina corporation with its principal place of business in Winston-Salem. Its business consists mainly of repair, maintenance, and service of tractor-trailer units and other automotive equipment, along with selling and providing parts for such equipment. Its principal customer is McLean, although it will provide service and sell parts to other parties.

McLean formed MAS in 1947 as a wholly-owned subsidiary in order to have a firm to service its equipment. Additionally, this arrangement benefits McLean financially since MAS passes on to McLean the discount which MAS obtains by acting as a national distributor of automotive parts.

MAS operates out of one business location in Winston-Salem. It leases its property from the Malja Corporation, which is also a wholly-owned corporation of McLean. McLean also leases a part of this property, which is contiguous with the operations of MAS, for its main office.

While MAS and McLean operate as separate businesses, they do to some extent pool various resources. Thus, the officers and directors of the two companies sometimes serve both companies, albeit in different capacities. The officers of each company do work together in order to advance their common purposes, such as formulating hiring standards and coordinating maintenance work with McLean's needs. Personnel records are kept by McLean for both companies. There is a joint recreational program for both companies.

In its operations MAS utilizes the following departments: automotive, unit rebuild, body, paint, trailer, parts, service lane, tire recapping and janitorial. It classifies its employees as mechanics, helpers, clerks, garagemen, or janitors. All janitors work in the janitorial department. All garagemen work either in the service lane or the tire recapping

department, which is the only classification in those two departments. The garagemen perform work similar to that done in a filling station, e. g., fueling equipment, changing oil and filters, replacing light bulbs, washing equipment, and changing tires. In the remainder of the departments the employees are classified as mechanics, helpers, and clerks. They do repair and maintenance work or fill stock orders.

At all material times to this action, MAS has employed over one hundred persons.

4. Local Union No. 391 (Local 391) is the bargaining representative for the Winston-Salem over-the-road drivers and terminal workers at McLean and for the employees at MAS. It is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Local 391 has its offices in Greensboro, North Carolina. At all material times to this action it has had more than one hundred members. Negroes constitute fifteen to twenty per cent of its membership.

The collective bargaining negotiations, covering both McLean's over-the-road drivers and its terminal employees, are national in scope. The National Master Freight Agreement covers both sets of employees and is negotiated at the same time. Thereafter supplemental agreements are made to fit the different requirements of the two groups. The road and terminal workers have been organized for some decades.

The maintenance employees at MAS were first organized in 1955. Since 1958, the bargaining for maintenance, as well as road and terminal employees, has been conducted between multi-employer and multi-union representatives. The janitors, who also belong to Local 391, are covered by a memorandum of understanding entered into between MAS and Local 391 and based upon the results of the maintenance contract negotiations.

(b) *Initiation of the Action by Plaintiffs*

5. Plaintiffs initiated action in this case by filing a complaint with the EEOC on May 31, 1967. In the first complaint all of the plaintiffs joined in charging McLean and Local 391. They denominated themselves as employees of "McClean [sic] Trucking Company." On the same day, plaintiff Warren filed a supplemental complaint against McLean. In answering a question on the complaint form as to who discriminated against him, he answered: "McClean [sic] Trucking Company (MAS)." This was the only instance where MAS was specifically mentioned in any of the plaintiffs' complaints. However, in his complaint, plaintiff Warren did state that jobs for Negroes were restricted to the dock and the tire departments, the latter department belonging to MAS.

The parties have stipulated that the EEOC made an investigation and issued a decision on October 12, 1967. They agree that the EEOC investigated the employment practices at both McLean and MAS. The EEOC issued a right-to-sue letter on May 14, 1968, and plaintiffs filed their complaint in this court on June 6, 1968.[1]

(c) *Hiring Practices by McLean*

6. The statistical evidence adduced as to McLean in this case shows a discriminatory pattern and practice of hiring. For example, out of over 400 general office workers, McLean had the following number of black employees: March 1966—6; March 1967—7; April 1968—10; November 1970—16. The number of blacks compared to the total work force of over-the-road drivers and terminal workers produced these figures: March 1966—39/728; March 1967—44/740; April 1968—42/736;

---

1. That initial complaint only charged McLean and Local 391 as defendants. Later, on June 2, 1969, plaintiffs amended their com-

plaint to add MAS as a party and to charge Local 391 with breach of the duty of fair representation.

November 1970—46/701. McLean hired its first black road driver in October 1967. By July 1968 it had four blacks working out of the Winston-Salem terminal as over-the-road drivers. In December 1969 it had eight blacks, and by November 1970 McLean had nine blacks employed at Winston-Salem out of a total work force of 479 over-the-road drivers. By November 1970 McLean officials testified that since July 2, 1965, they hired 150 drivers, sixty of whom were black and that nine or ten of them were assigned to the Winston-Salem terminal. The company officials candidly stated that until the time they hired their first black driver, their company had a deliberate policy of not hiring blacks as drivers. The change in policy came about after company officials met with persons from EEOC and the contract enforcement people of the Post Office Department.

7. While blacks have worked beside whites at the Winston-Salem terminal as switchers and checkers, no black has ever held the job of city driver. However, the people working on the dock can bid for a city driver job, and some blacks have qualifications for bidding on the job of driver if they desire. Terminal employees—that is, checkers, switchers, and city drivers—receive the same pay. McLean has had difficulty in getting checkers to bid on a city driver vacancy because the men are not interested in assuming the additional burden of being out in the weather and facing driving hazards when they receive no extra compensation for their efforts.

8. In 1967 McLean started making an affirmative effort to recruit black over-the-road drivers. It advertised in papers circulated predominantly in the black community, contacted urban leagues, and requested help from its employees. As of 1970, the efforts produced twenty-five applications from blacks, while the company had over a thousand applications from whites. At that time the company had drivers who were on layoff status.

9. In 1965 McLean had a reputation in the black community of Winston-Salem of not hiring blacks to drive trucks, and MAS had a reputation of giving the good jobs to whites. At the time of the trial in 1971, the reputations of the two companies had improved.

(d) *Hiring Practices at MAS*

10. The employment record of MAS reflects both a discriminatory hiring practice and a segregation of employees by race. In 1969 the departments of automotive, unit rebuild, body, paint, trailer, and parts had 119 employees, all of whom were white. The pay scale ranged from $3.68/hr. to $4.03/hr. The service lane had 37 workers, 15 of whom were black. The tire recapping department had 20 workers, 17 of whom were black, and there were six janitors, all of whom were black. The service lane and tire recapping workers received $3.64/hr., and the janitors $2.72/hr. This pattern remained about the same in 1970, with the exception of one black helper who was employed in the trailer department. Prior to May 1969 all the persons working in the tire recapping department were black.

11. At least as early as 1963, MAS had a deliberate policy of only hiring blacks in the tire department. The explanation given for this by MAS was that those workers had such a high productivity rate and low rate of absenteeism that the company did not want to break up the group. However, after the production of the tire recapping department began to decline in 1969, MAS decided to hire whites into the department.[2]

---

2. At one time the blacks in the tire department were the only ones at MAS who did not have janitors assigned to clean their toilets. They did it themselves. They filed a grievance about this with the union in 1967.

The matter was arbitrated but not concluded until the spring of 1969 when MAS on its own started to assign janitors to do the work.

12. From July 2, 1965, to December 1969, MAS hired thirteen men in the automotive department, five in unit rebuild, two in body, two in trailer, and four in parts—all of whom were white. In 1970 MAS had offered four blacks employment in the trailer department; a vocational education trainee declined the offer for personal reasons; one was hired but laid off and employed in the tire recapping department; plaintiff Olstead declined the offer;[3] and one individual accepted the job and was able to work at it.

(e) *Job Posting at MAS*

13. Since the early 1960's, MAS has had a policy of not posting job vacancies.[4] In order for a man to move to a higher classification in a department, he would have to be informed of the opening by rumor or by employer contact. As a result of no-posting policy, the black employees had no knowledge of any job openinings in the other departments at MAS, except on a perchance basis. This in turn deprived the black community of Winston-Salem of information about job vacancies in the all-white departments at MAS.

(f) *Joint Hiring Procedure*

14. McLean and MAS have a joint hiring operation. McLean does the initial screening and testing of applicants. The personnel office where these operations take place is located upon Mc-

Lean's property and staffed with McLean employees. The personnel files for both McLean and MAS employees are kept in that office. The same application form is used for both McLean and MAS. The form has the heading "McLean Trucking Company, Winston-Salem, North Carolina, Application for Employment." After a person passes the screening and testing process, he is referred to a department supervisor at either MAS or McLean for final approval. MAS and McLean supervisors make the final decision in hiring their employees but have no control over who is referred to them for hiring.

The persons who interview applicants testified that they refer persons to specific jobs on the basis of work orders from the departments at McLean and MAS and on the basis of an applicant's request. If no job openings exist at the time, the interviewer places the application in piles, differentiating between those applicants who have special skills and those who do not. No attempt is made to demarcate between potential MAS employees or potential McLean employees. One interviewer testified that he refers an applicant to a particular job based on his evaluation of the applicant's interest, education, and past experience. He said that he never gave an applicant an option of taking a particular job. He said it was inconceivable that a person would be qualified for

---

3. The ostensible reason given to the company by Olstead for his refusal was that he would have to start with low seniority and thus be relegated to the second or third shift. At that time the tire department in which he worked had one shift, Monday–Friday, from 7:00 A.M. to 4:00 P.M. Evidently he felt that the convenience of working daytime hours and only on week days outweighed the higher pay of the job in the trailer department.

4. There have been two exceptions to that rule. In 1970 MAS posted an opening for a tire truck delivery job to the entire work force at MAS. No one signed up for it. Many of the plaintiffs testified that they did not apply because they would only receive

9¢ an hour more for a job which involved irregular hours and difficult work. They also expressed distrust and fear that the company might be unduly harsh with them if they had problems with the job. The other posting occurred in 1970, when MAS asked all of the garagemen who wanted to be promoted to helpers to sign up so that their qualifications might be judged by the Qualifications Committee. This last posting was done pursuant to a change in the collective bargaining contract which permitted garagemen the opportunity of moving out of the service lane or tire recapping departments and into the other formerly all-white departments at MAS. This posting was done on a one time basis.

more than one position at either McLean or MAS. Another interviewer stated that if two jobs were open at the time, he would ask an applicant about his job preference and would give him the choice of which job to take.

The application form also has a space for listing job preferences. However, the interviewers do not explain the different job categories at MAS or McLean to the applicants.

(g) *Hiring Standards at MAS and Mc-Lean*

15. Since the mid-1960's, MAS has required that new employees meet certain qualifications. They must have a high school education or its equivalent, be twenty-one years old, not be related to another employee, and have had no previous employment with either MAS or McLean. MAS also requires that the applicant obtain a minimum score on a Wonderlic test, which measures mechanical aptitude skills and motor dexterity. The minimum score needed on the commercial tests given is the national cutoff or a lower score, as determined by the test maker.[5] The only employees needing a special skill are the ones assigned to the trailer department, in which case they must know how to weld. Otherwise, the qualifications are the same for every other position at MAS.

Aside from numerical differences in the test scores or age of the individual, the general qualifications for an over-the-road or terminal job at McLean are about the same. No special skills are required for those jobs. In fact, McLean prefers to train its over-the-road drivers itself. It is one of the few companies having a driver's training school for its truck drivers. All drivers, regardless of their past experience, must attend the school. The program lasts three weeks and includes classroom and road driving training. The only driving experience necessary is to have driven a vehicle during the four seasons for a period of one year. The driving experience need not be with a truck. No mechanical ability is needed, or in fact, desired.

(h) *Restrictions on Employee Movement Between Jobs at McLean and MAS as a Result of:*

(1) Contract Provisions

16. To a limited extent, the collective bargaining contracts covering employees at McLean and MAS determined their mobility between jobs at the companies. The contracts themselves neither permit nor prohibit an employee from seeking another job position. However, the contracts do affect mobility in that they contain seniority provisions which affect bidding and layoff rights and other valuable rights an employee may accumulate via longevity at a particular position.

At least since 1964, all three of Local 391's contracts with McLean and MAS have seniority provisions. The over-the-road supplement, the city cartage supplement, and the maintenance contracts all provide for company seniority measured from the last date of hire with the company. Company seniority is used for determining vacation rights only. The over-the-road supplement also has terminal seniority determined by the length of employment at the terminal for purposes of bidding on runs and for layoffs and recalls. The city cartage supplement for terminal employees has a terminal seniority provision which is defined as the length of time in *all* classifications at a particular terminal. This seniority is used for bidding on job vacancies in other classifications, as well as for layoff rights. Under the maintenance agreement there are two additional types of seniority in addition to com-

---

5. Plaintiffs made no showing that blacks were disqualified from employment at a higher rate than whites because of the tests or because of any other factor.

pany seniority.[6] One is departmental seniority which is the length of time spent in a particular department. The other is classification seniority which is the length of time in a particular classification within a particular department. Under the maintenance contract an employee could use classification seniority for selection of shift and workweek preference. He can use departmental seniority for layoff and recall. In the event of layoff, a person who had fully exhausted his departmental seniority could use any departmental and classification seniority he acquired in another department to bump back into that department. In the event the company promoted someone in a department into a higher classification, qualified persons in the next lower classification within that department were given the right to bid on the opening ahead of new hirings.

## (2) No-Rehire Rule

17. McLean and MAS have two rules that prevent job movement between and within the two companies. The first one is the no-rehire rule. Both companies have a policy of not rehiring an employee who has quit his job. Neither McLean nor MAS will hire back one of its former employees nor hire a former employee of the other. The ostensible reason given for the rule is that it makes an employee think before he moves on to another job, after the company has trained him. McLean supervisors said that the rule prevents a man from returning and becoming jealous when he finds that his former friends have more seniority than he has. While the rationale of the rule appears to concern mostly the experience McLean has had with its over-the-road drivers, the rule is applied to all departments of McLean and MAS.

## (3) No-Transfer Rule

18. Both companies have a policy which prevents transfers between the two companies and between different departments within the same company. As with the no-rehire rule, nothing in the collective bargaining contract mandates this position taken by the companies.

From at least 1960, McLean and MAS had a policy prohibiting transfers by employees from one contract unit to another. The rule applied to transfers between and within the companies. Thus an employee could not transfer between the jobs covered by over-the-road, city cartage, or maintenance agreements.

McLean supervisors gave a partial explanation for the rule. They testified concerning the problems that arose when over-the-road drivers could transfer freely to the city cartage agreement jobs, and vice versa. At one terminal where this was permitted, the persons with the highest seniority would bid on the higher paying over-the-road jobs during the summer and then switch to the terminal jobs when the bad winter weather appeared. This situation caused dissatisfaction among employees with low seniority. This explanation does not explain, of course, why limited transfer rights could not be granted.

These supervisors also gave an explanation for prohibiting transfers between MAS and McLean. They stated that if a MAS employee could transfer to an over-the-road driving job, he may cause problems because he might use any mechanical knowledge learned by his work with MAS to tamper with the engine settings of the trucks. However, it was admitted that the present over-the-road drivers can and do have other persons commit those violations for them. Furthermore, experience in the paint de-

---

6. These general rules were effective up through March of 1970. After that the new contract experienced changes. Some were minor, such as basing shift and workweek preference selection on departmental rather than classification seniority. Other changes were major, such as the promotion provisions added for garagemen, which is discussed in Finding No. 22.

partment at MAS does not seem to be a very likely place to learn how to do mechanical work on a truck engine.

Facially, the reasons given in support of the no-transfer rule often appear to be frivolous. The most substantial factor in support of the rule is that both McLean and MAS dislike job transfers. They train a man for one position and then want to keep him there so he will not have to be retrained.

19. The no-transfer rule does not prohibit employees from changing jobs within the same department. Since over-the-road drivers comprise an entire department and a single classification, the exception to the rule does not apply to them. It does, however, permit transfers within departments under the city cartage and maintenance agreements.

20. At least beginning with the 1964 contract, employees under the city cartage contract could transfer within that department between classifications. For example, a person could transfer from being a switcher to a city driver job. In fact, in 1960 McLean posted a notice at the terminal requesting applications for the position of city driver. The offer was made to both black and white terminal employees.

21. In the 1960's an employee at MAS could transfer within his department to different classifications. However, until 1964 the employee would lose his seniority if he, for example, moved from a helper classification to mechanic in his department. Interdepartmental transfers were not permitted, and further job openings were not posted, so no problem developed over transfers between departments. After 1964 an employee could move within his department to a different classification and retain his departmental seniority so that in event of a layoff, an employee can exercise his full departmental seniority to bump back into a lower classification he previously held in that department.

22. Since the only classification in the tire recapping and service lane de-partments is that of garageman, a man had no place to move in those departments. The no-transfer rule prevented him from moving to another department in MAS or to another department at McLean.

Local 391 sought and secured changes in this situation. In 1967 the contract was changed to permit a transfer between departments at MAS. The company retained sole discretion over whether to permit the move, and the employee had to meet current day-hiring standards. Because of the later provision, Local 391 would not agree to the provision and wanted to strike, but this was vetoed by the International. In 1970 Local 391 succeeded in securing for the garagemen at MAS the right to bid on vacancies in helper positions arising at MAS before the company could hire off the street. Article 5, Section 2, of the contract provides:

(c) Job Vacancy and Promotion

When the company makes a promotion to a higher classification within a department, qualified men by seniority in the next lower classification of that department will be given the opportunity for promotion ahead of new hirings.

Where there is a need for an additional helper in any department covered by this Agreement, any employee classified as garageman who is qualified as set out in Article 23, Section 4, or 6(b), shall have the right to bid for such work. The senior qualified employee bidding shall be awarded the work, but he shall become junior in the new department, for all purposes, except he shall have Company seniority for fringe benefits.

If any qualified employee refuses a promotion into a higher classification when offered by the employer, he shall not thereafter be eligible for promotion during the term of this agreement.

In event the company and the union cannot agree on a man's qualifications, the

controversy is submitted to a qualifications committee, and eventually to binding arbitration, if necessary. Shift and work week preference is based on a man's departmental seniority. Employees retain their old departmental seniority, and in event of a layoff, they may exercise that seniority to bump back into their old department.

23. There have been exceptions to the no-rehire rule and the no-transfer rule. The record shows eight such deviations from the companies' policy. Most of them occurred before 1960 and were permitted because of some special personal problem of the employee. The exceptions applied to one black, as well as a few whites. In addition plaintiff Cannon's employment record shows that he was hired in 1950 in the tire department and left in 1953 to serve a prison sentence for fighting. He returned in 1954 as a new hire to MAS to work in the service lane, in apparent violation of the no-rehire rule. One year later he was transferred to the tire recapping department, on management direction, in apparent derogation of the no-transfer rule.

### (i) *Plaintiffs' Testimony*

24. Plaintiffs' testimony concerning their employment situation with MAS reveals a spectrum of experiences and desires. Plaintiff Counts, hired in 1954, said that he likes working in the tire department and does not want to go elsewhere. Plaintiff Cannon also seeks no other position. Plaintiff Brown, who was hired in 1966, chose to work in the tire recapping department at MAS as opposed to working on the dock at the McLean terminal. He was offered both jobs but chose the latter because then, the tire department had regular hours. Plaintiff Henry, employed in 1963, chose the tire department over the dock because he did not want to be out in the weather. There was a slight indication that these last two men felt that the interviewers encouraged them to take the tire job over dock work. Other plaintiffs, such as Caldwell, Allen, Fries, and Cuthrell, indicated little desire or initiative to obtain any other position at either MAS or McLean.

25. Generally, plaintiffs evidenced reluctance to sign up for the new helpers' positions made available under the 1970 contract for a variety of reasons. Some were unwilling to forfeit the seniority they had acquired in the tire department. Some were fearful to move to new positions because they had brought this suit against the company. Others did not like the uncertainty of leaving a secure position and accepting a new and unfamiliar job. Some plaintiffs felt the company might use the mistakes they made in learning a new job as a pretext to fire them. Plaintiffs Henry and Wynecoff gave some indication that they felt themselves too old to start learning a new position. Plaintiff Grier wanted to move to a new position, but did not think he should have been required to take a day off to appear before the Qualifications Committee in order to be transferred to a helper position at MAS. Plaintiff Olstead, although qualified and offered a position as a helper in the trailer department, refused because of the pending case and the fact that he would have to work nights since he would lose his accumulated seniority and start at the bottom on the departmental seniority roster.

26. Of all the plaintiffs, only Hairston and Warren sought to be employed as an over-the-road driver. Hairston was employed in the tire department in 1966. After a sixty-day probationary period he asked to be transferred to McLean to be able to drive over-the-road. He was told he would have to resign and apply for the position and pass the examinations. He reminded the McLean supervisors that there was a no-rehire rule. They conceded that this would prevent him from making the move. Hairston never applied for the tire-truck position in 1969 nor did he sign up for a helper's position in 1970.

Plaintiff Warren was hired as a garageman in the tire department in 1963. Around 1968, he heard McLean was hiring blacks as over-the-road drivers and asked McLean supervisors to be transferred. McLean would not let him fill out an application and said they had no openings. Warren then got his own tractor and drove it on a lease basis for other companies. In 1969 he went back to McLean and filled out an application for an over-the-road position. McLean never acted on the application.

(j) *Local 391's Treatment of Plaintiffs*

27. Local 391 has represented the plaintiffs and the other workers of McLean and MAS under the three contracts with them. It has instituted grievances in behalf of the plaintiffs and did so with the bathroom cleanup incident mentioned in footnote 2. While plaintiffs inquired about road driver jobs in 1967, they did not present Local 391 with a proposal that transfers in general be permitted across contract lines. Plaintiffs never asked Local 391 for permission to transfer to jobs under the city cartage agreement. Starting in the mid-1960's, Local 391 attempted to obtain greater transfer rights for the garagemen. In 1967 Local 391 requested permission to strike when the trucking companies agreed to greater transfer rights, but at present day hiring standards. Finally in 1970, Local 391 obtained transfer rights for the garagemen using former hiring standards which did not include the requirement of having a high school education.

28. The Court finds that Local 391 knew and, in spite of denials, by reasonable implication should have known that McLean did not hire black over-the-road drivers until 1967. Local 391 knew or should have known that MAS's tire recapping department was composed totally of blacks until 1969. However, the Court does not find any overt acts of discrimination which perpetuated the situation. Indeed Local 391 was instrumental in securing for the plaintiffs the right to transfer into other formerly white departments at MAS. On the other hand, Local 391 took no affirmative action to rectify discriminatory hiring practices of McLean or MAS. It did not try to remedy the continuing effect of the past discrimination by advocating that the garagemen be permitted to retain their past seniority when they moved to a helper's position under the 1970 contract, nor did it attempt to secure transfer rights from MAS to McLean. Thus any fault which Local 391 bears in this case arises because of its acquiescence to both companies' hiring practices and because of its sluggish efforts to remedy the situation.

*Conclusions of Law*

In their respective proposed findings of fact and conclusions of law the parties have briefed certain issues which they have raised in this case. Plaintiffs request the Court to redefine the membership of the class to include "all black persons who were employed at either McLean or MAS prior to 1967." They also ask that any remedial relief given concerning expanded job opportunities for them not require that they meet current day hiring standards; in particular that the requirements of a high school education and minimum test scores be prohibited. They also seek back pay and attorneys' fees.

MAS and McLean seek the resolution of various issues. First, they challenge the maintenance of this suit as a class action, claiming the plaintiffs are not too numerous to be joined. MAS seeks dismissal as to itself because the action was not brought against it until after the thirty-day period following plaintiffs' receipt of their right-to-sue letter from the EEOC and further, because no EEOC complaint has ever been filed against MAS by plaintiffs. McLean asserts that the action cannot be maintained against it because that company is not the plaintiffs' employer. Local 391 also questions the Court's jurisdic-

tion as to it in regard to the fair representation allegations.

1. The Court has jurisdiction over this matter pursuant to Section 706(f) of the Act, 42 U.S.C. § 2000e–5(f).

2. McLean and MAS are both employers in an industry affecting commerce, within the meaning of Section 701(b) of the Act, 42 U.S.C. § 2000e(b).

3. Local 391 is a labor organization engaged in an industry affecting commerce, within the meaning of Section 701(d) and (e) of the Act, 42 U.S.C. § 2000e(d) and (e).

4. Plaintiffs have complied with the procedural requirements of Section 706(a), (d), and (e) of the Act, 42 U.S.C. § 2000e–5(a), (d), and (e). The Court concludes that McLean, MAS, and Local 391 have all been properly joined as defendants in this action.

## Discussion

MAS contends that there is no jurisdiction over it because it was not made a party until after thirty days from the time plaintiffs received their right-to-sue letter from the EEOC. Section 706(e) of the Act, 42 U.S.C. § 2000e–5(e), has been interpreted as a jurisdictional statute requiring an aggrieved party to file suit in district court within thirty days from the reception of his right-to-sue letter. Stebbins v. Nationwide Mutual Insurance Company, 469 F.2d 268 (4th Cir. 1972); Bowe v. Colgate-Palmolive Company, 416 F.2d 711, 719 (7th Cir. 1969). However, in the instant case, plaintiffs filed suit within the required time. Approximately one year thereafter, they sought to amend their complaint making MAS a party. The Court granted the motion. Rule 15(c), Federal Rules of Civil Procedure, provides for the amended pleadings to relate back to the time of the filing of the original complaint. When the amended complaint adds parties, relation back is permitted if the added party had notice of the original suit and knew or should have known of the mistake in omitting them. MAS had an intimate relationship with McLean, and, therefore, must have known not only of the filing of suit in this court, but also of the prior EEOC investigation. It certainly could not be and was not prejudiced by the amended complaint.

The Court also rejects MAS's contention that the Court has no jurisdiction over it because it was not named as a respondent in the plaintiffs' EEOC complaints. While suits cannot be brought in the district court against persons not previously charged before the EEOC, (See Mickel v. South Carolina State Employment Service, 377 F.2d 239 (4th Cir. 1967), cert. denied, 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166 (1967)), that rule does not cover the fact situation of this case. Here plaintiff Warren wrote in his complaint with the EEOC that he was an employee of "McClean [sic] Trucking Company (MAS)." Complaints filed with the EEOC are to be construed liberally because those filing them are not lawyers, but laymen. Furthermore, the EEOC actually investigated both McLean and MAS. This constitutes sufficient notice to MAS of its alleged involvement in the practice complained of by plaintiffs. Since it was investigated, it had sufficient opportunity to defend itself and participate in any conciliation efforts.

In addition, MAS's contention does not fall upon sympathetic ears because its use of McLean's hiring office obviously confused plaintiffs as to whom their true employer actually was. Equity demands that when an employer causes the confusion that the innocent employee not be made to suffer.

A further reason exists for holding that the Court has jurisdiction over MAS, in spite of the fact that MAS was not named as a respondent in the EEOC complaint. On November 21, 1972, this Court denied plaintiffs' motion to amend their complaint in which they sought to allege a violation of 42 U.S.C. § 1981. In that order, the Court

noted that it would be quite concerned if the denial of the motion would result, at this late date, in the loss of jurisdiction over any of the parties. There is authority for the view that a party alleging violation under 42 U.S.C. § 1981 need not satisfy the exhaustion requirement of Section 706(e) of the Act, 42 U.S.C. § 2000e–5(e). Waters v. Wisconsin Steel Wks. of Internat'l Harvester Co., 427 F.2d 476 (7th Cir. 1970), cert. denied 400 U.S. 911, 91 S.Ct. 137, 27 L. Ed.2d 151 (1970); Caldwell v. National Brewing Company, 443 F.2d 1044 (5th Cir. 1971), cert. denied 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972).[7] The issues have been fully litigated by all parties, and they all actively participated in the trial of this action. If defendants were indeed serious about their technical challenge to the Court's jurisdiction under the Civil Rights Act of 1964, they should have brought this to the Court's attention when it considered plaintiffs' motion to add an allegation of a violation of 42 U.S.C. § 1981 to its cause of action. That would have been a factor which would have influenced the Court to grant plaintiffs' motion.[8]

■ McLean's challenge to the jurisdiction of the Court also lacks merit. It alleges that this civil rights action may not be brought against it because the plaintiffs are not its employees. On its face the contention is frivolous inasmuch as Section 703(a) of the Act, 42 U.S.C. § 2000e–2(a), provides coverage for "any individual." It does not limit itself to employees.

It may be that McLean means that it cannot be held responsible for the discrimination practiced by MAS against the plaintiffs. If so, then the argument may pose some difficulty. If plaintiffs were suing McLean solely on the basis that McLean at one time had a policy of not hiring blacks as over-the-road drivers, then the failure to hire, being a completed act, would not constitute a continuing discrimination. Plaintiffs then may not have filed their EEOC complaint in time to satisfy the jurisdictional requirements. However, if McLean is being sued because of its participation in the discrimination practiced by MAS, then McLean may be arguing that only MAS, which is the actual employer, may be held responsible.

■ Generally when one party is charged with a civil rights violation for discriminating against someone else's employees, the courts look to see whether a relationship of principal and agent has been formed. Butler v. Local No. 4 and Local No. 269, Laborers' Int. U., 308 F.Supp. 528, 530 (N.D.Ill.1969); Batiste v. Furnco Construction Corporation, 350 F.Supp. 10 (N.D.Ill.1972); Mickel v. South Carolina State Employment Service, *supra.* If such a relationship is found to exist, then both parties can be held liable.

■ In the instant case, the actions of McLean and MAS establish an agency relationship. Where two distinct corporations act in concert and in such a manner so that one company's policy causes or perpetuates the discrimination

7. Being concerned with a wholesale circumvention of the conciliation procedures contained in the Act, 42 U.S.C. § 2000e, through use of 42 U.S.C. § 1981, some courts have suggested equitable limitations for § 1981. Brown v. Gaston County Dyeing Machine Company, 457 F.2d 1377, 1387 (4th Cir. 1972)—(Judge Dupree, concurring in part, dissenting in part); Caldwell v. National Brewing Company, *supra.*

8. This reason has equal application to Local 391 as well. Although the Court holds that plaintiffs have failed to prove their charge

of breach of the duty of fair representation brought against Local 391, (See Conclusion No. 7), it also holds that Local 391 is a proper party in this action. Robinson v. Lorillard Corporation, 319 F.Supp. 835 (M. D.N.C.1970), aff'd in part and rev'd in part, 444 F.2d 791 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L. Ed.2d 655 (1971). The remedy eliminating discrimination might affect the contracts to which the union is a signatory party. Thus Local 391 will remain a party in this suit, if for no other reason than to effectuate the injunctive relief which may be forthcoming.

practiced by the other, then both companies must answer to the charges of discrimination brought by the affected persons. Here there was a common hiring office and a coordination of employment policies. In hiring workers, McLean employees would refer applicants to a particular department at MAS. McLean knew about MAS's policy of segregating its work force. McLean then helped perpetuate the discrimination through use of its no-rehire and no-transfer policies which it applied to MAS employees. McLean's liability arises from its fostering and participating in the discrimination, and by perpetuating it.

However, McLean's involvement goes beyond that of being an agent. It is directly liable as a principal for its actions. When a black applicant went to the McLean hiring office, he faced a double discrimination. First, he was subject to being placed in MAS's segregated departments. Second, McLean would refuse to even consider the applicant for an over-the-road driving job. Thus McLean not only fostered MAS's discriminatory · employment practices, but in so doing, this also accommodated its own unlawful practices of not hiring black over-the-road drivers, because McLean was able to divert black applicants to MAS. By using its restrictive no-rehire and no-transfer rules, McLean then perpetuated its discriminatory act of not hiring black over-the-road drivers by locking blacks in the segregated departments at MAS.[9] McLean's actions do not even approach having a reason of business necessity to support them.

Thus McLean is guilty of discrimination not only as an agent, but also as a principal. The fact that McLean does not employ plaintiffs does not alter the situation. McLean faces liability jointly with, and independently from, MAS.

The Court would adhere to this conclusion even if MAS were not a wholly-owned subsidiary to McLean. Indeed, the fact that MAS, and not McLean, employs plaintiffs merely states one of the bases of plaintiffs' complaint. It does not have any jurisdictional significance.

5. This suit is a class action under Rule 23(b), Federal Rules of Civil Procedure, and is properly maintainable as such. While Judge Stanley's determination of the class confined itself to the blacks employed in the tire recapping department of MAS, the Court feels that the evidence adduced at the trial justifies the broader determination requested in plaintiffs' complaint. Reed v. Arlington Hotel Company, Inc., 476 F.2d 721 (8th Cir. 1973). Rule 23(c)(1), Federal Rules of Civil Procedure, provides in part: "An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." The Court realizes that the redefinition of the class comes late in the day, even though it comes before a decision on the merits, as required in Rule 23(c)(1). The district court in Sprogis v. United Air Lines, Inc., 56 F.R.D. 420 (N.D.Ill.1972), faced the question of whether it should convert an individual action into a class action after it had found that defendant was guilty of discrimination, and *after the affirmance of the decision on the merits* on an interlocutory appeal. It declined to do so. It reasoned that at that stage in the proceeding the only determination left for consideration would be back pay, and that since the common questions of fact and law had been previously decided, the fairer approach would be to let the other individuals present their claims and let the company use its defenses. That case involved an air line's enforcement of a no-marriage policy by which it terminated employees

---

9. These policies also perpetuated McLean's prior discrimination against black employees hired into the Winston-Salem terminal under the city cartage contract. Those employees also could not transfer to an over-the-road driving job due to the no-rehire and no-transfer policies. McLean's jurisdictional argument does not affect those employees who are in fact actually employed by McLean.

who married. There the company might have had valid defenses as to those individuals who waited to see whether plaintiff would win or lose before they requested to join in and be bound by the action. Thus a late determination converting the action into a class action after it was certain that relief would be forthcoming could result in basic unfairness to the employer by depriving it of its defense of the statute of limitations should it lose the action.

In the present case, unlike *Sprogis*, the Court deals with a problem of *continuing* discrimination perpetuated by the companies' no-rehire and no-transfer rules. This type of discrimination serves to toll any filing requirements under the Act. Tippett v. Liggett & Myers Tobacco Company, 316 F.Supp. 292, 296 (M.D.N.C.1970); Belt v. Johnson Motor Lines, Inc., 458 F.2d 443 (5th Cir. 1972). The fact that the class action arises pursuant to Rule 23(b)(2) leads the Court to conclude that redefining the class will not prejudice defendants or cause them to lose valuable defenses. In a class action of this type it is not necessary for all plaintiffs of the affected class to have used the EEOC compliance procedure. Tippett v. Liggett & Myers Tobacco Company, *supra*; Younger v. Glamorgan Pipe and Foundry Company, 310 F.Supp. 195, 197 (W. D.Va.1969); Barela v. United Nuclear Corporation, 462 F.2d 149, 153 (10th Cir. 1972). The Court deems it necessary to enlarge the class in order to effectuate the broad remedial purposes of the Act. (See Reed v. Arlington Hotel Company, Inc., *supra*, and Baxter v. Savannah Sugar Refining Corporation, 350 F.Supp. 139, 141 (S.D.Ga.1972)—where the class was enlarged in the Court's decision on the merits in a Rule 23(b)(2) class action employment discrimination case.)

Therefore, the Court redefines the class as follows: (a) In regard to discrimination practiced by McLean in not hiring blacks for over-the-road truck driving jobs, the class includes all blacks now employed, or who were employees on or after July 2, 1965, either at MAS, or at McLean's terminal in Winston-Salem, provided such persons were hired prior to October 1967, the date McLean began hiring black over-the-road drivers. (b) In regard to the discrimination and segregation practiced by MAS in confining blacks to the garageman and janitorial classifications, the class includes all blacks now employed, or who were employees on or after July 2, 1965, at MAS, provided such persons were hired prior to April 1, 1970, the date the collective bargaining contract for the maintenance employees and the memorandum of understanding for the janitors permitted garagemen and janitors to transfer into other departments at MAS.

■ 6. (a) The policy and practice of McLean in refusing to hire blacks for over-the-road truck driving positions constitute a present and continuing discrimination against the members of the affected class and an unlawful employment practice in violation of Section 703(a) of the Act, 42 U.S.C. § 2000e–2(a).

(b) The policy and practice of MAS in placing black employees into only the garageman and janitorial classification constitute a present and continuing discrimination against the members of the affected class and an unlawful employment practice in violation of Section 703(a) of the Act, 42 U.S.C. % 2000e–2(a).

(c) The policy and practice of McLean and MAS, acting in concert through the use of a single hiring office, and the coordination of employment regulations exemplified by the no-rehire and no-transfer rules, when taken in conjunction with the present and past discrimination of the two employers, constitute a present and continuing discrimination against the members of the affected class and an unlawful employment practice in violation of Section

703(a) of the Act, 42 U.S.C. § 2000e–2(a).

(d) The policy and practice contained in the contracts and memoranda of understanding between MAS and Local 391 act as a deterrent to the members of the affected class in transferring to better jobs, and tends to perpetuate the prior hiring and assignment discrimination by causing garagemen to forfeit all prior seniority when transferring to all-white departments at MAS, and by causing janitors to forfeit all prior seniority when moving to a garageman classification at MAS. Seniority is a term, condition and privilege of employment, and the denial of previously-accumulated seniority to members of the affected class upon their transfers to higher paying jobs discriminates against them in violation of Section 703(a) & (c) of the Act, 42 U.S.C. § 2000e–2(a) & (c).

## Discussion

This case presents a clear case of employment discrimination based upon race. Some of the discrimination is no longer being practiced; some continues to exist. The evidence shows that McLean discontinued its policy of not hiring blacks for over-the-road drivers in October 1967. Since that time, it has made active efforts in minority recruitment and, in fact, has employed many blacks in that position.

 In the case of MAS, there is some evidence that it has made efforts to discontinue its policy of hiring blacks solely for garageman and janitorial classification positions. As of the date of the trial, it had hired only a few blacks to work in the all-white departments. These statistics have persuasive force in establishing on-going discrimination, particularly in light of the company's centralized hiring and its policy of not posting job vacancies. The failure to post jobs results in depriving the black community of notice of job vacancies since only the white workers in the department in which the vacancy exists will know of the opening. United States v. Chesapeake and Ohio Railway Company, 471 F.2d 582, 586–587 (4th Cir. 1972), cert. denied, Locals 268 and 1130 of the Brotherhood of Railroad Trainmen, 411 U.S. 939, 93 S.Ct. 1893, 36 L. Ed.2d 401 (1973). The relief as to MAS will need to involve a continued surveillance in order to ensure the eradication of all discrimination.

 As to both MAS and McLean there exists the problem of dealing with past discrimination. The hiring practices of both companies excluded black employees from certain positions. The restrictions, contained in the no-rehire and no-transfer rules, tend to prevent blacks from now obtaining positions from which they were formerly excluded. Even MAS's new provision in its maintenance contract permitting garagemen and janitors to transfer to formerly all-white jobs does not present an adequate remedy. The employees who transfer lose their accumulated seniority, although they do retain it for purposes of bumping back into their old department in case they are laid off. Nevertheless, the blacks after obtaining a helper position in a new department must compete against the whites without benefit of their past seniority. Thus the effects of the past discrimination continue into the present. "Seniority systems which perpetuate past racial discrimination violate the Act." *Id.* at 587. "The rule is well-established that, where discrimination violations of the Act have been found, the remedy granted must eliminate all residual effects of past discrimination to the greatest extent practical." Rock v. Norfolk and Western Railway Company, 473 F.2d 1344, 1348 (4th Cir. 1973). Thus, even though the Court holds that the bargaining units and the seniority system of the companies have a bona fide purpose, to the extent that they perpetuate past discrimination, they will not be permitted to be used.

In order to eradicate the past effects of prior discrimination it will be necessary to allow transfers not only between departments of the same company but also between departments of both companies. The action is mandated by United States v. Chesapeake and Ohio Railway Company, *supra*. McLean presented persuasive evidence that permitting at-will transfers between the over-the-road contract and the city cartage contract caused problems. Its reasons for preventing MAS employees from obtaining over-the-road jobs was supported with considerably less force. However, any fears occasioned by the thought of permitting *limited* transfers have been answered in United States v. Chesapeake and Ohio Railway Company, *supra*, 471 F.2d at 593.

> A good deal of their argument is based on a misapprehension of Title VII and the remedies appropriate to enforce it. The defendants envision havoc if all 24,000 of the C & O's employees are entitled to use company seniority to bid for vacancies across craft lines. The short answer to their fears is that the law does not command this result. Title VII does not require either the company or the unions to forego the benefits afforded management and employees by nondiscriminatory craft, departmental, and seniority systems. Application of the Act normally involves two steps. First, identification of the employees who are victims of discrimination, and second, prescription of a remedy to correct the violation disclosed by the first step. The Act does not require the application of the remedy to employees who are not subject to discrimination.

The Court will attempt to apply those principles in its order.

It may be noted that the definition of the affected class will be enlarged to include blacks hired under the city cartage contract at the Winston-Salem terminal. It does not appear that the discriminatory hiring practices pertained to those employees, except to the extent that, until 1967, the blacks hired under the city cartage contract had no opportunity to expect employment with McLean as an over-the-road driver. Thus, while the remedy will not affect those jobs, it will include those black employees. The members of the affected class hired under the city cartage contract will be offered a chance to transfer to an over-the-road position at McLean. Those members of the affected class hired initially as MAS will be offered an over-the-road position at McLean, or a chance to transfer to a helper position at MAS, at their discretion. Transfers will take place as vacancies arise.

The cases of United States v. Chesapeake and Ohio Railway Company, *supra*, and Rock v. Norfolk and Western Railway Company, *supra*, indicate that the courts must deal with the problem of seniority in effectuating the remedial provisions of the Act. In *Chesapeake*, the Fourth Circuit intimated that seniority rights previously earned could be kept even in the situation where the affected class member transfers across bargaining units to a position which he had been previously denied. Therefore, when a member of the affected class applies for a transfer and is accepted in a new position, he will carry with him his previously-accumulated company seniority. When a member of the affected class competes in a new position at McLean, he will be able to use his company seniority, and the person against whom he competes may also use his company seniority. Those members of the affected class competing in a new position at MAS can use their company seniority as if it were departmental seniority. However, their classification seniority pertaining to a new position will start to accumulate as would any other employee. This will permit a member of the affected class to use his company seniority to protect himself against layoffs and thus serve to alleviate his fears in transfer-

ring to a new department. On the other hand, by limiting their classification seniority to that which is actually accumulated, plaintiffs will be required to proceed in promotions in their new department under the provisions of the contract. This will ensure that they will have adequate training before they advance to a higher position.

Because McLean always trains its new employees, no matter what their previous experience in over-the-road trucking, and since the employees at MAS generally need no special qualifications and are trained on the job, the allowance of transfers should not pose any significant problems.

██ ██ While the plaintiffs did not present any evidence that the companies' hiring standards discriminated against blacks, they do request that if remedial relief be granted, that the company not use the new present day standards. In particular plaintiffs request the prohibition of use of minimum scores on tests and use of the high school education requirement. In light of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the companies would be advised to act cautiously in applying any hiring standards in evaluating persons under the order of this Court. While the companies need not hire or transfer individuals not capable of performing the job, if they choose to use any standards, they must "assess an employee's ability without regard to his race using only job related criteria." United States v. Chesapeake and Ohio Railway Company, *supra,* 471 F.2d at 593. Thus, unless the companies' present employees all meet the present day hiring standards, there will be a strong presumption against the validity of the present day standards, if applied to plaintiffs.

██ ██ 7. Plaintiffs have failed to prove that Local 391 has violated its duty of fair representation.[10] Plaintiffs have not stated any statutory basis upon which to predicate their allegation of unfair representation. Such charges are usually based upon federal question or civil rights jurisdictional provisions and to a limited extent upon 29 U.S.C. § 185(a), Waters v. Wisconsin Steel Wks. of Internat'l Harvester Co., *supra,* 427 F.2d at 491. The problem with plaintiffs' position is that they have not cited any contract provision violated by the union, nor have they alleged that the union failed to pursue any complaint or grievance presented to it by plaintiffs. They simply allege that Local 391 acquiesced in the discriminatory policy of the two companies. This situation is unlike that in Tippett v. Liggett & Myers Tobacco Company, *supra,* where the union failed to pursue grievances based on charges of discriminatory layoffs. Here the basic discrimination arose when plaintiffs were hired. There is no evidence that the union controlled or participated in the hiring practices of the companies, either by a direct contract provision in the collective bargaining agreement or by implication, such as by making significant referrals of applicants to the employer. After the hiring, the policies of the companies concerning the no-rehire and no-transfer rules perpetuated the discriminatory hirings. Had plaintiffs requested that Local 391 negotiate changes in the collective bargaining agreement giving the union rights to participate in the selection of new employees and allowing the plaintiffs broad transfer rights, and if the union then refused to negotiate those requests, the situation might be different. However, on the present fact situation, plaintiffs have not proved their claim

---

10. However, Local 391 will remain a party to this action, see footnote 8. Irrespective of the failure to prove a breach of the duty of fair representation, in some cases the employer's violation of the Act, 42 U.S.C. § 2000e is so blatant that the union too becomes a participant in the violation by mere "passivity at the negotiating table." Macklin v. Spector Freight Systems, Inc., 156 U.S. App.D.C. 69, 478 F.2d 979, 989 (1973).

that Local 391 violated its duty of fair representation.

8. Defendants have intentionally engaged in and are intentionally engaging in the unlawful employment practices previously described within the meaning of Section 706(g) of the Act, 42 U.S.C. § 2000e–5(g).

9. The unlawful employment practices of defendants do not come within the exceptions of Section 703(h) of the Act, 42 U.S.C. § 2000e–2(h), pertaining to bona fide seniority or merit systems, insofar as the company rules and the employment contract perpetuate the previous hiring discrimination practiced by McLean and MAS.

10. By virtue of the authority vested in the court by Section 706(g) of the Act, 42 U.S.C. § 2000e–5(g), the Court will enjoin the discriminatory practices and provide affirmative relief necessary to eradicate the effects of the past discrimination, and such other affirmative relief as appropriate.

The Court's order will include provisions of back pay and attorneys' fees, as mandated by Moody v. Albemarle Paper Company, 474 F.2d 134, 142 (4th Cir. 1973).

The determination that back pay is an integral part of the relief to be granted under the Act does not end the inquiry. In each case there may be a general right to back pay, but the question of entitlement is a different matter. The right to back pay may be defeated by the employer's showing of good faith in certain limited circumstances. Moody v. Albemarle Paper Company, *supra,* at 142, fn. 5. On the other hand, entitlement to back pay depends upon other equitable factors pertaining to the employee and the ability of the Court to effectively supervise the awards. United States v. Georgia Power Company, 474 F.2d 906, 922 (5th Cir. 1973). Those factors look to the good faith of the employee. Particularly in this case, it seems appropriate to focus

(1) on an employee's subjective intent as to whether he would have sought a different job, (2) on whether he was qualified for a different job, and (3) on when and how he made his desires known. These factors necessarily vary with each individual. (See Findings of Fact Nos. 24–26). As stated in Moody v. Albemarle Paper Company, *supra,* 474 F.2d at 142: "It is to be remembered, of course, that a back pay award is limited to damages which are actually suffered. Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971)."

In the instant case, only the plaintiffs Hairston and Warren presented evidence that they applied for a different position. They requested an over-the-road driving job. There is no evidence that the others subjectively and objectively sought a change in their employment, and some even rejected offered opportunities. It is important to note that in this case the pay differentials between positions at MAS do not vary greatly since job progression is set up on an industrial union basis, rather than on a craft union basis. Further, computation of back pay for those wishing to transfer to an over-the-road job may well prove to be an adventure in speculation since earnings are based on the number of routes upon which an employee can bid, and on the number he actually takes. Therefore, in light of the fact that only plaintiffs Hairston and Warren sought a change in their circumstances, and also in view of the costs of administration in relation to any foreseeable return, as well as the speculative nature of any other possible claims, the Court will award back pay only to those two named plaintiffs.

It is, therefore, ordered that within thirty (30) days of the filing of these Findings and Conclusions, the parties will prepare and submit a proposed consent order consistent with the opinion expressed herein. Along with the other provisions, the order shall include injunctive relief, with the specific require-

ment that the Court retain jurisdiction over MAS to ensure an end to the discriminatory practices and to ensure that affirmative steps be taken to raise the percentage of black employees in the all-white departments of MAS. The parties may find instructive, and are referred to, the consent decree filed in the case of United States v. Pilot Freight Carriers, Inc., C–143–WS–71 (M.D.N.C. 1973). If the parties cannot so agree, they shall within forty-five (45) days of the filing of these Findings and Conclusions, file their separate proposed order enforcing the Court's Findings and Conclusions. In addition, plaintiffs will submit within forty-five (45) days of the filing of these Findings and Conclusions, suggested methods whereby the back pay may be determined.

## JUDGMENT

This case was tried on its merits. Thereafter, this Court filed its Findings of Fact and Conclusions of Law dated August 31, 1972, and requested the parties to submit their proposed judgments. This having been done the Court has reconciled the proposals, made some additional changes, and issued an Order along with this Judgment to implement some of the provisions of this Judgment.

It is hereby ordered, adjudged and decreed:

1. The defendants, McLean Trucking Company (McLean), Modern Automotive Services, Inc. (MAS), and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 391 (Local 391), their officers, agents, employees, successors and all persons in active concert or participation with them or any of them are permanently enjoined from engaging in any act or practice at the facilities of McLean and MAS located in Winston-Salem, North Carolina, which has the purpose or the effect of discriminating against black persons because of their race or color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. The affected classes of persons entitled to relief under paragraphs 5 to 8 of this Judgment are as follows:

A. In regard to discrimination practiced by McLean in not hiring blacks for over-the-road driving jobs, the class includes all black persons employed as of the entry of this Judgment or who were employees on or after July 2, 1965, either at MAS or McLean's terminal in Winston-Salem, provided such persons were hired prior to October 1967, the date McLean began hiring blacks as over-the-road drivers.

B. In regard to the discrimination and segregation practiced by MAS in confining blacks to the garageman and janitorial classifications, the class includes all blacks employed as of the entry of this Judgment or who were employees on or after July 2, 1965, at MAS, provided such persons were hired prior to April 1, 1970, the date the collective bargaining contract for the maintenance employees and the memorandum of understanding for janitors permitted garagemen and janitors to transfer into other departments at MAS.

C. In regard to Local 391, the class includes all persons described in paragraphs 2A and 2B above.

*Procedure for Filling Vacancies in the Over-the-Road Driver Classification*

3. Within thirty (30) days after the entry of this Judgment, McLean and MAS shall inform in writing all members of the affected class as defined in paragraphs 2A and 2B, above, of their rights under this Judgment to transfer to over-the-road driving positions with seniority rights as provided in paragraphs 7 and 8 of this Judgment. A copy of such notice shall be presented to counsel for the plaintiff prior to distribution to members of the affected class.

4. Members of the affected class shall have thirty (30) days after

receipt of the letter to express an interest in transferring to an over-the-road driving position. Any member who does not express an interest within thirty (30) days after receipt of the letter shall be deemed to have waived any right to the seniority rights as provided in paragraphs 7 and 8 of this Judgment.

5. When vacancies occur in over-the-road driving positions, McLean and MAS shall contact those members of the affected class who have expressed an interest in transferring in order of their original hire date at either McLean or MAS and the most senior affected class member shall be offered the opportunity to qualify to become an over-the-road driver. Any member of the affected class who transfers and fails to qualify shall be notified in writing of the reasons he failed to qualify. Any member of the affected class who enters McLean's driver training school and drops out before completing the course (except for reasons beyond his control) shall be deemed to have waived his right to transfer with the seniority rights provided in this Judgment.

6. If any member of the affected class rejects an opportunity to qualify to become an over-the-road driver except for cause beyond his control, he shall be deemed to have waived his rights to transfer with the seniority rights provided by this Judgment

7. Members of the affected class who transfer to over-the-road positions shall be credited with their terminal seniority at Winston-Salem for purposes for which seniority is used, including competition with other employees for work opportunities, layoffs, bid preferences, and vacation schedule.

8. Members of the affected class who have established their qualifications to become over-the-road drivers and have been assigned to that position after so qualifying shall have a thirty-day probationary period during which they shall have the right to return to their previous position without a loss of seniority if they do not wish to continue driving. Such return shall constitute a rejection of an opportunity within the meaning of paragraph 6.

*Filling Vacancies Under the Carolina Automotive Maintenance Agreement*

9. When vacancies occur, members of the affected class initially hired at MAS shall be offered the opportunity to qualify for an over-the-road driving position at McLean as provided in paragraphs 5 to 8, above, or an opportunity, if qualified as provided in paragraph 11, to transfer to a helper's position in the automotive, unit rebuild, body, paint, trailer or parts department at MAS at their discretion. McLean and MAS shall notify these class members of their option to transfer to an over-the-road position or to a helper's position in the notice to be delivered to them under paragraph 3, above.

10. When vacancies occur, those members of the affected class who indicate an interest in a helper's position at MAS and are qualified as provided in paragraph 11 of this Judgment, shall be entitled to use their seniority at Winston-Salem as if it were departmental seniority as defined in the Carolina Maintenance Agreement. However, their classification seniority, as defined in the Carolina Maintenance Agreement, pertaining to the new position will start to accumulate as in the case of any other employee. This will permit a member of the affected class to use his seniority at Winston-Salem to protect himself against layoffs; on the other hand, by limiting his classification seniority to that which is actually accumulated, the affected class member shall be required to proceed in promotions in his new department under the provisions of the contract, and thus assure that he will have adequate training before he advances to a higher position.

*Qualification*

11. Qualifications of affected class members who indicate an interest in

transferring to an over-the-road driver position at McLean or a helper's position at MAS pursuant to the provisions of this Judgment shall be determined by using only job-related criteria.

### Rate Retention

12. Members of the affected class who transfer pursuant to the provisions of this Judgment shall not be paid at a lower wage rate than the position from which they have transferred until such time as they have had an opportunity to bid and to qualify for a position which pays at least the rate of the position from which they transferred. In the case of those members of the affected class who transfer to over-the-road driver positions at McLean, this provision shall only apply during the training periods and shall not be effective thereafter.

### No Transfer and No Rehire

13. McLean and MAS are enjoined from applying their no-rehire and no-transfer rules to employees who seek to transfer from McLean to MAS or from MAS to McLean. This does not prohibit either company from denying the request of a particular employee to transfer to a job in the other company for an otherwise valid business reason.

### Hiring Procedure

14. McLean and MAS shall, within thirty (30) days of the entry of this Judgment, develop an "Employment Registration" form which shall be given to all persons personally applying in Winston-Salem for employment by McLean or by MAS whether or not they are employed. The applicant shall be informed of the various job classifications at both McLean and MAS. This employment registration form shall be kept on file by McLean or MAS for ninety (90) days. If an opening occurs in Winston-Salem at either McLean or MAS within the area of job interest and qualifications on his employment registration form, and if McLean or MAS is accepting applications for employment (mentioned in the succeeding paragraph) for such job, the person signing the employment registration form (unless then employed by McLean or MAS) will be notified at the address or telephone number shown on such form so that he may apply for such a job by filling out and signing an "Application for Employment."

15. In the event a job applicant or a person who has on file a current employment registration form (and who is not then employed by McLean or MAS) appears basically qualified for any position in Winston-Salem with McLean or MAS which is within his area of job interest, he shall be allowed to complete an "Application for Employment." An applicant shall be considered basically qualified if he is without any obvious physically disqualifying handicap and he meets the appropriate age requirement. This definition shall apply only for determining whether the applicant shall be given an opportunity to complete an application for employment. If a black person who completes an application for employment is considered unqualified for employment, he shall be told of the reasons why he is considered unqualified for employment.

16. Subject to the availability of qualified black applicants, McLean shall fill over-the-road driver positions in the ratio of at least one black for every one other employee hired for such positions. Such obligations shall continue until such time as the number of black over-the-road drivers at McLean's Winston-Salem terminal is approximately twenty per cent (20%) of the total number of over-the-road driver employees in any reporting period provided in paragraphs 22 and 23 of this Judgment.

17. Subject to the availability of qualified black applicants, MAS shall fill positions in the automotive, unit rebuild, body, paint, and trailer departments in the ratio of at least one black for every other employee hired in these depart-

ments. Such obligation shall continue until such time as the number of blacks in these departments is approximately twenty per cent (20%) of the total number of employees in these departments in any reporting period provided in paragraphs 22 and 23 of this Judgment.

### Collective Bargaining Agreements

18. The collective bargaining agreements now in effect between McLean, MAS and Local 391 and all subsequent collective bargaining agreements between these defendants shall remain in and continue to have full force and effect except insofar as such agreements are inconsistent with the provisions of this Judgment. Should a conflict arise between the provisions of a collective bargaining agreement and the provisions of this Judgment, the terms of this Judgment shall prevail.

### Notice

19. The defendants shall give notice of this Judgment to all of their employees and members by posting copies of it in conspicuous places, e. g., bulletin boards throughout the facilities of MAS and McLean in Winston-Salem, North Carolina, and on the bulletin board at Local 391's office at Colfax, North Carolina.

### Costs, Expenses and Attorneys' Fees

20. Plaintiffs are hereby awarded their costs of this action to be taxed against the defendants in the following proportions: One-third each as to MAS, McLean and Local 391.

21. Plaintiffs are entitled to recover reasonable attorneys' fees and expenses as part of their costs of this action. In the absence of an agreement between the parties as to costs, expenses and attorneys' fees, plaintiffs are directed to file with the Court a statement of costs and expenses and an itemization of services by their attorneys rendered in connection with this case within twenty (20) days after the entry of this Judgment. The defendants shall have twenty (20) days thereafter to file their comments on the submissions of the plaintiffs. The Court will then decide these matters.

### Records and Reports

22. McLean and MAS shall maintain records of all applications, hirings, assignments, promotions, transfers, disqualifications and dismissals at their Winston-Salem, North Carolina, facilities for a period of three years. Local 391 shall maintain records of all grievances filed by employees of McLean and MAS at their Winston-Salem, North Carolina, facilities for a period of three years. This obligation, unless extended by the Court, shall terminate February 1, 1977.

23. Within a reasonable time, not to exceed ninety (90) days after the entry of this Judgment, McLean and MAS shall file with the Court and serve upon counsel for the plaintiffs, and for every six (6) months thereafter for a period of three years, reports for their Winston-Salem, North Carolina, facilities showing job classification and race as follows:

A. The total number of employees as of the end of the period.

B. The number of persons hired and the number of persons terminated during the period.

C. The number of applicants for employment who were not hired during the period. If the individual's application is not pending at the end of the period, the name and address of all black applicants who are no longer under consideration.

D. The name and status of all members of the affected class who expressed an interest in transferring pursuant to the provisions of this Judgment.

### Back Pay

24. All claims for relief in the nature of back pay are denied in the discretion of the Court except as to plaintiffs Patrick T. Hairston and Theodore R. Warren, Jr. Unless the parties reach

agreement, the matter of back pay will be set for trial before the United States Magistrate who will prepare findings of fact and conclusions of law to be submitted with his recommendation. Back pay shall be taxed against the defendants in the following proportions: One-half each as to MAS and McLean.

### Retention of Jurisdiction

25. The Court retains jurisdiction of this matter to issue such other orders and to conduct such other proceedings as may be necessary to effectuate this Judgment.

## MEMORANDUM ORDER

■ On August 31, 1973, this Court entered Findings of Fact and Conclusions of Law concerning the above-entitled matter. There the Court requested the parties to submit their proposed judgments in accordance with the Court's decision. The Court has reconciled the proposed judgments, and for the most part has adopted the parties' suggestions. In paragraph 12 of the Judgment the Court has permitted those members of the affected class who transfer to keep their former salary as a minimum base in order that they will not be discouraged from transferring to those jobs which the defendants' discriminatory policy has prevented them from previously attaining. In the case of those members of the affected class who transfer to over-the-road driving jobs, they may keep their former salary only for the training period. This will ensure that they are not discouraged from transferring. After that time, however, they will have to rely upon their additional seniority which the Court has provided them in order to bid on jobs. It would be inappropriate for the Court to also permit them to keep a minimum mandatory wage in the case of over-the-road drivers. The very nature of the job is such that there is no guaranteed wage. The employees' only protection in being able to earn money is their seniority rights whereby those with the most seniority can bid on and obtain more and better runs. If the additional seniority given the members of the affected class is not now sufficient to ensure them earning sufficient money, then it would not have been sufficient even had the defendants not discriminated against them. While those members of the affected class are entitled to receive their former wage rate during the training period, if they seek and receive back pay, the difference in their former wage rate and that amount the company pays other employees going through the training period is an element to be shown in the mitigation of any back pay award.

The judgment also incorporates McLean's and MAS's proposals in paragraphs 14 and 15, since they have advised the Court that they are in fact developing a new employment application procedure.

■ The Judgment holds Local 391 liable for costs and attorneys' fees. The Court has done this because it feels that Local 391, by its acquiescence, shares a part of the blame in discriminating against plaintiffs. While Local 391 took no affirmative action in discriminating, it certainly knew of the companies' actions and encouraged such by its own inactions. Therefore, the Court feels that it would be equitable for Local 391 to pay one-third of the costs and attorneys' fees, but no part of any back pay award. Local 391 plays an important role in the employment situation at MAS and McLean by representing the plaintiffs. The Court feels that its decision will serve to promote the policy and purposes of the Civil Rights Act of 1964 by encouraging those who have the power to stop discrimination to use that position. The fact that some of the members of Local 391 reject its leadership's remedial proposals does not alter the situation. Otherwise a union would always have a ready excuse for fostering and promoting discrimination by inaction. Holding the union liable should help to

**674**

motivate a union to actively seek to eliminate the type of blatant discrimination against its own members present in this case.

In regard to back pay, the parties have submitted proposals which are in major agreement. One point of contention is when the back pay liability first arises in the case of plaintiffs Hairston and Warren. From the Court's Findings and Conclusions it is evident that plaintiff Hairston first made known his desire to have an over-the-road driving job in 1966, and plaintiff Warren did so in 1968. In the event the parties are unable to agree, further proof on this matter will permit the setting of the exact dates. On motion of either party, the matter will be set to be tried before the Magistrate. At such hearing the parties may present their evidence on damages and in mitigation thereof, as they have indicated in their proposals.

## MOTION FOR RECONSIDERATION

■■■■ After final judgment had been entered in this action, defendant Local 391 made a motion pursuant to Rules 59(e) and 60(b), Federal Rules of Civil Procedure, for reconsideration and to reopen the record, in order to contest the imposition of one third of the attorneys' fees and costs against it. It states that in view of this Court's expansion of the class, it should be permitted to present additional evidence, and that during the trial it reserved its right in that regard. Local 391 states that in the Findings of Fact and Conclusions of Law the Court held that Local 391 was liable solely for the purposes of imposing injunctive relief.[1] Last, Local 391 says that the

expansion of the class caused it to lose valuable defenses which it now wishes to present. Defendants McLean and MAS and Plaintiffs oppose the motion.

Plaintiffs contend that the record does not support the contention that Local 391 was given a right to reopen if the scope of the class should change, and in any event, Local 391 lost that right when it failed to present evidence at an October 13, 1972, hearing where the Court gave the parties a chance to present additional evidence before a decision was reached on the merits. This position is well taken, and the Court finds that Local 391 has no right to reopen in order to present additional evidence.

The expansion of the scope of the class, which occurred in this Court's Findings of Fact and Conclusions of Law, did not prejudice Local 391. Thus Local 391's proposed new evidence would not change the Court's determination of attorneys' fees and costs. The complaint in this case was filed in June of 1968. It was tried before the late Honorable Edwin M. Stanley in June of 1971. Pursuant to stipulation, this Court issued its findings and conclusions in August of 1973. Most of Local 391's additional evidence consists of showing that it attempted to negotiate changes in the companies' transfer policies, and that in 1973 it secured the right to transfer with seniority within the maintenance contract, and between the city cartage and over-the-road contracts. This allegedly would show that Local 391 did take affirmative steps to end the continuing discrimination caused by the companies' discriminatory hiring policies.

1. The Court did not state that Local 391 would remain a party only for injunctive purposes. In footnote 8 of the Findings of Fact and Conclusions of Law the Court stated that "Local 391 will remain a party in this suit, *if for no other reason* than to effectuate the injunctive relief . . .." However, that footnote made reference to Conclusion No. 7, which contains footnote

10. There the Court stated: " . . . in some cases the employer's violation of the Act, 42 U.S.C. § 2000e is so blatant that the union too becomes a participant in the violation by mere 'passivity at the negotiating table.' Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 989 (1973)."

■ These subsequent good faith efforts cannot, however, completely negate the past action, or inaction, of Local 391. Its prior acquiescence in the conditions existing at McLean and MAS makes it responsible for those conditions. Later efforts made to rectify the discrimination do not wipe the slate clean. Thus the Court has held defendant McLean liable for back pay, attorneys' fees and costs even though it began hiring blacks in 1967 for over-the-road driving positions. The union would expect to have a preferred position by having its subsequent acts absolve it of all responsibility.

■■ The Court's findings of fact adequately cover the efforts of Local 391 in this case up through 1971. The Court is positive that both the companies and Local 391 could present favorable evidence if the record should be reopened. However, even if defendants were permitted to reopen in order to present such evidence, that could not affect the judgment concerning attorneys' fees and costs entered in this case. The reason for imposing attorneys' fees is "not only to penalize defendants for pursuing frivolous arguments, but to encourage individuals to vindicate the strongly expressed congressional policy against racial discrimination." Robinson v. Lorillard Corporation, 444 F.2d 791, 802 (4th Cir. 1971). In this case the discrimination was blatant. While Local 391 did not do any of the discriminatory hiring, it certainly had to be aware of the discrimination. This discrimination affected the black members of Local 391. Its duty, as expressed in Robinson v. Lorillard Corporation, *supra*, at 799, is as follows:

> Title VII requires that both union and employer represent and protect the best interests of minority employees. Despite the fact that a strike over a contract provision may impose economic costs, if a discriminatory contract provision is acceded to the bargainee as well as the bargainor will be held liable.

United States v. N. L. Industries, Inc., 479 F.2d 354, 379 (8th Cir. 1973), and Macklin v. Spector Freight Systems, Inc., *supra*. Yet in this case Local 391 did not protest the discriminatory hiring practices, or the no-rehire rule. It utterly failed to interest itself with the treatment of its black members. Thus it is appropriate that Local 391 be penalized and plaintiffs be encouraged at Local 391's expense.

■ It was only in 1967 that Local 391 attempted to do something by proposing the right to transfer in and between the contract units. In the case concerning transfers within the maintenance contract, Local 391 maintains that in 1967 the other local unions involved overruled its attempt to strike over the issue. Nevertheless Local 391 must be held responsible for the sins of her sister locals. To do otherwise would provide a ready excuse for a union to fail to carry out its duty to fairly represent and protect its black members. The rights of minority workers can no more be voted away by sister locals, than they can be bargained away by an employer and a union.

The Court has considered the corrective actions taken by Local 391 and weighed its responsibilities relative to that of MAS and McLean. For this reason it made the two companies solely liable for back pay. The Court could not and will not let Local 391 go completely free without paying for its omissions. *See* Sabala v. Western Gillette, Inc., 362 F.Supp. 1142, 1155 (S.D.Tex.1973), where attorneys' fees were apportioned equally against both the company and the union. The reasons for assessing one third of the costs and attorneys' fees against the union were stated in the Court's Order filed on January 23, 1974:

> While Local 391 took no affirmative action in discriminating, it certainly knew of the companies' actions and

encouraged such by its own inactions. Therefore, the Court feels that it would be equitable for Local 391 to pay one-third of the costs and attorneys' fees, but no part of any back pay award. Local 391 plays an important role in the employment situation at MAS and McLean by representing the plaintiffs. The Court feels that its decision will serve to promote the policy and purposes of the Civil Rights Act of 1964 by encouraging those who have the power to stop discrimination to use that position. . . . Holding the union liable should help to motivate a union to actively seek to eliminate the type of blatant discrimination against its own members present in this case.

It is, therefore, ordered that defendant Local 391's motion for reconsideration and to reopen should be, and the same hereby is, denied.